## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **KAREN CARTER**, **MELISSA PORTER**, **TRACEY COLEMAN**, and **ALEEMA HAWKS**, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> **MYHERITAGE (USA), INC.,** <br><br> Defendant. | Case No. 1:25-cv-224 <br><br><br> **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs Karen Carter, Melissa Porter, Tracey Coleman and Aleema Hawks (collectively, "Plaintiffs"), individually and on behalf of all similarly situated persons, allege the following against My Heritage (USA), Inc. ("MyHeritage" or "Defendant") based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation by Plaintiffs' counsel and review of public documents as to all other matters:

### I.  INTRODUCTION

1.      A person's genetic code is the single most sensitive piece of information pertaining to them. It can reveal a multitude of private facets of their life, including their health conditions, ethnic background, predisposition to cognitive and physical disorders, their parentage, and the parentage of their children.

2.      Consequently, when individuals undergo genetic testing, they are subject to an inherent risk: if their genetic information is misused or improperly disclosed by a testing company,

it can never be fully remedied. Unlike a credit card number, telephone number, or even a social security number, genetic information is immutable. It cannot be altered to preclude an individual with access from using it or sharing it with an unauthorized third party in the future.

3.      Unfortunately, unbeknownst to Plaintiffs and other visitors to Defendant's website, Defendant does not keep sensitive information about its visitors private. Instead, Defendant collects and transmits personally identifiable information regarding both the fact that its customers have been subject to genetic testing, and the results of that genetic testing (collectively, "Genetic Testing Information"), to third parties, including Alphabet, Inc. ("Google"), through its use of surreptitious online tracking tools.

4.      Online advertising giants, like Google, compile as much information as possible about American consumers, including information relating to the most private aspects of their lives, as fuel for their massive, targeted advertising enterprise. Thus, any information about a person captured by those online behemoths can be used to stream ads to that person. If Google receives information that a person is using genetic testing to research their ancestry or health conditions, they will use that information, and allow their clients to use that information, to stream ads to that person's computers and smartphones related to other genetic testing products, as well as products and services related to the person's genetic results or health conditions.

5.      Google offers website operators access to its proprietary suites of marketing, advertising, and customer analytics software, including Google Analytics, Google AdSense, and Google Tag Manager (collectively, the "Business Tools"). Armed with these Business Tools, website operators can leverage Google's enormous database of consumer information for the purposes of deploying targeted advertisements, performing minute analyses of their customer bases, and identifying new market segments that may be exploited.

6.     But, in exchange for access to these Business Tools, website operators install Google's surveillance software on their website (the "Tracking Tools"), including 'tracking pixels' ("Pixels") and third-party 'cookies' that capture sensitive, personally identifiable information provided to the website operator by its website users. This sensitive information can include a unique identifier that Google uses to identify that user, regardless of what computer or phone is used to access the website.  The Tracking Tools can also capture and share other information like the specific webpages visited by a website user, items added to an online shopping cart by a website user, information entered into an online form by a website user, and the device characteristics of a website user's phone or computer.

7.     In essence, when website operators use Google's Business Tools, they choose to participate in Google's mass surveillance network and, in turn, benefit from Google's collection of user data at the expense of their customers' privacy.

8.     MyHeritage is one of the many companies that has chosen to prioritize its marketing efforts over its customers' privacy, by installing Google's Tracking Tools on its website.

9.     MyHeritage is a direct-to-consumer ("DTC") genetic testing kit provider that uses DNA testing to identify its customers' "unique ethnic background."[1] According to its website, "[m]illions of families around the world use MyHeritage to explore their history.[2]

10.     To use Defendant's genetic testing service, consumers purchase one of Defendant's test kits through its website, www.myheritage.com (the "Website"), or from third-party retailer, and provide a saliva sample to the Defendant for its analysis.

---

[1] *Home Page*, MYHERITAGE, https://www.myheritage.com/ (last visited Jan. 5, 2025).

[2] *Id*.

11.     To receive their genetic testing results, Defendant's customers, like Plaintiffs and Class Members, are required to register on Defendant's Website. When Defendant completes its genetic analysis, Defendant's customers must log into its Website portal to view their genetic testing results.

12.     In its Privacy Policy, Defendant explicitly promises its customers, like Plaintiffs and Class Members, that "MYHERITAGE HAS NEVER SOLD OR LICENSED GENETIC DATA OR HEALTH DATA, AND WILL NEVER DO SO IN THE FUTURE."[3]

13.     Each of the Plaintiffs and Class Members visited the Website and had their personal Genetic Testing Information tracked by Defendant using the Tracking Tools.  However, Defendant **never** obtained authorization from Plaintiffs or Class Members to share their Genetic Testing Information with third parties. At all times relevant to this action, Plaintiffs and Class Members gave no informed consent for information about their Genetic Testing Information to be transmitted to the third parties, including the largest advertiser and compiler of consumer data in the world.

14.     Defendant's transmission of Plaintiffs' and Class Members' genetic testing information was not just contrary to its customers' reasonable expectation of privacy and its own Privacy Statement – it was also a violation of Illinois law.

15.     In recognition of the highly sensitive nature of genetic testing information, several states have enacted legislation decreeing that genetic testing and information derived therefrom is confidential. These statutes, such as the Illinois Genetic Information Privacy Act, 410 ILCS 513/1,

---

[3] *Privacy Policy*, MYHERITAGE, https://www.myheritage.com/privacy-policy (last visited Jan. 5, 2025).

*et. seq* ("GIPA") acknowledge that maintaining the confidentiality of genetic information is in the public interest.[4]

16.     Consistent with this goal, GIPA provides strong legal protections to ensure that Illinois residents can take advantage of the knowledge that can be gained from obtaining personal genetic information, without fear that this same information could be disclosed to third parties without their consent.

17.     GIPA prohibits DTC test kit companies like Defendant from sharing information derived from genetic tests, including the fact that an individual was the subject of a genetic test. Such information may be released only to the individual tested and to persons specifically authorized by the test subject.

18.     Defendant chose to repeatedly disregard Illinois' genetic privacy laws by sharing consumers' confidential genetic information.

19.     Accordingly, Plaintiffs seek on behalf of themselves, and all of Defendant's other similarly situated employees in the state, an order: (i) requiring Defendant to cease the unlawful activities discussed herein; and (ii) awarding actual and/or statutory damages to Plaintiffs and the members of the proposed Class.

## II.     PARTIES

*Plaintiff Karen Carter*

20.     Plaintiff Carter is a citizen of the state of Illinois, residing in LaSalle County and brings this action in an individual capacity, and on behalf of all others similarly situated.

---

[4] *See* 410 ILCS 513/5(2)-(3): "[M]any members of the public are deterred from seeking genetic testing because of fear that test results will be disclosed without consent in a manner not permitted by law[.]"; "The public health will be served by facilitating voluntary and confidential nondiscriminatory use of genetic testing information."

21.     In or around November of 2023, Plaintiff Carter purchased a genetic test kit from Defendant. When the results of her genetic testing were made available by Defendant, Plaintiff was required to use Defendant's Website on her personal electronic devices to review the findings of Defendant's genetic analysis.

22.     Plaintiff Carter reviewed the results of her genetic testing in the same manner as depicted in Section V(A)(d), *infra*.

23.     Plaintiff Carter never authorized Defendant to disclose any aspect of her communications with Defendant through its Website to third parties, including the Genetic Testing Information that she provided to Defendant.

24.     On every occasion that she visited Defendant's Website, Plaintiffs Carter possessed accounts with Google, and she accessed Defendant's Website while logged into her Google account on the same device.

25.     After providing her Genetic Testing Information to Defendant through the Website, Plaintiffs Carter immediately began seeing targeted online advertisements for genetic testing products.

### Plaintiff Melissa Porter

26.     Plaintiff Porter is a citizen of the state of Michigan, residing in Macomb County and brings this action in an individual capacity, and on behalf of all others similarly situated.

27.     In or around November of 2023, Plaintiff Porter purchased a genetic test kit from Defendant. When the results of her genetic testing were made available by Defendant, Plaintiff was required to use Defendant's Website on her personal electronic devices to review the findings of Defendant's genetic analysis.

28. Plaintiff Porter reviewed the results of her genetic testing in the same manner as depicted in Section V(A)(d), *infra*.

29. Plaintiffs Porter never authorized Defendant to disclose any aspect of her communications with Defendant through its Website to third parties, including the Genetic Testing Information that she provided to Defendant.

30. On every occasion that she visited Defendant's Website, Plaintiffs Porter possessed accounts with Google, and she accessed Defendant's Website while logged into her Google account on the same device.

31. After providing her Genetic Testing Information to Defendant through the Website, Plaintiffs Porter immediately began seeing targeted online advertisements for genetic testing products.

***Plaintiff Tracey Coleman***

32. Plaintiff Coleman is a citizen of the state of Georgia, residing in Cobb County and brings this action in an individual capacity, and on behalf of all others similarly situated.

33. In or around February of 2023, Plaintiff Coleman purchased a genetic test kit from Defendant. When the results of her genetic testing were made available by Defendant, Plaintiff was required to use Defendant's Website on her personal electronic devices to review the findings of Defendant's genetic analysis.

34. Plaintiff Coleman reviewed the results of her genetic testing in the same manner as depicted in Section V(A)(d), *infra*.

35. Plaintiff Coleman never authorized Defendant to disclose any aspect of her communications with Defendant through its Website to third parties, including the Genetic Testing Information that she provided to Defendant.

36.     On every occasion that she visited Defendant's Website, Plaintiffs Coleman possessed accounts with Google, and she accessed Defendant's Website while logged into her Google accounts on the same device.

37.     After providing her Genetic Testing Information to Defendant through the Website, Plaintiffs Coleman immediately began seeing targeted online advertisements for genetic testing products.

### Plaintiff Aleema Hawks

38.     Plaintiff Hawks is a citizen of the state of New Jersey, residing in Essex County and brings this action in an individual capacity, and on behalf of all others similarly situated.

39.     In or around January of 2024, Plaintiff Hawks purchased a genetic test kit from Defendant. When the results of her genetic testing were made available by Defendant, Plaintiff was required to use Defendant's Website on her personal electronic devices to review the findings of Defendant's genetic analysis.

40.     Plaintiff Hawks reviewed the results of her genetic testing in the same manner as depicted in Section V(A)(d), *infra*.

41.     Plaintiffs Hawks never authorized Defendant to disclose any aspect of her communications with Defendant through its Website to third parties, including the Genetic Testing Information that she provided to Defendant.

42.     On every occasion that she visited Defendant's Website, Plaintiffs Hawks possessed accounts with Google, and she accessed Defendant's Website while logged into her Google accounts on the same device.

43. After providing her Genetic Testing Information to Defendant through the Website, Plaintiffs Hawks immediately began seeing targeted online advertisements for genetic testing products.

***Defendant My Heritage (USA), Inc.***

44. My Heritage (USA), Inc. is a limited company incorporated in the State of Delaware, with its principal place of business at 3098 Executive Parkway, Suite 275, Lehi, UT 84043, in Utah County.

### III.    JURISDICTION AND VENUE

45. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members and minimal diversity exists because Plaintiffs and many putative class members are citizens of a different state than Defendant. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

46. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this Complaint alleges question of federal laws under the ECPA (18 U.S.C. § 2511, *et seq.*).

47. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein from part of the same case or controversy.

48. This Court has personal jurisdiction over Defendant because Defendant regularly conducts business in the State of Illinois, and because Defendant has advertised and sold its DTC genetic testing products to consumers in the State of Illinois and in this judicial district.

49. Personal jurisdiction is also proper because Defendant committed tortious acts in the State of Illinois and this judicial district and Plaintiffs' claims arise out of such acts, and/or

because Defendant has otherwise made or established contacts in the State of Illinois and in this judicial district sufficient to permit the exercise of personal jurisdiction.

50. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims in this action occurred in this judicial district.

## IV.  THE ILLINOIS GENETIC INFORMATION PRIVACY ACT ("GIPA")

51. During the 1990s, the U.S. government poured billions of dollars into the Human Genome Project in an attempt to map the entire human genetic code. When President Clinton announced the first successful "rough draft" of the Project in 2000, he hailed it as one of the great achievements of human history, and said: "Today we are learning the language with which God created life[.]"[5]

52. However, like any great leap in human understanding, learning the meaning of people's genetics came with many concerns. One movie released around this time, the dystopian science fiction movie *Gattaca*, attempted to show how this new technology could be abused. The movie conjured a not-too-distant future where genetic discrimination was rampant. In the movie, companies segregated people based on their genetic profiles, those with better genetic profiles (i.e., genetically engineered humans) were eligible for professional employment, while others with less desirable genetics (e.g., susceptibility to heart disease or cancer) were unemployable or relegated to menial jobs. Since its release, the film has been regularly used in schools to show the possible misuses of genetic information.[6]

---

[5] Nicholas Wade, *Scientists Complete Rough Draft of Human Genome*, NEW YORK TIMES (June 26, 2000), *available online at*: https://archive.nytimes.com/www.nytimes.com/library/national/science/062600sci-human-genome.html?amp;sq=francis%252520collins&st=cse&scp=23.

[6] Hannah Docter-Loeb, *What Do People Who Work in Genetics Think About Gattaca 25 Years After Its Release*, SLATE (Aug. 15, 2022), https://slate.com/technology/2022/08/gattaca-25th-anniversary-genetics-crispr.html (last accessed Jan. 5, 2025).

53. Illinois stood at the forefront of protecting its citizens from the abuse of this technology when it first passed GIPA in 1998. According to the Illinois Legislature, the intent of GIPA is to encourage the public to embrace genetic testing by eliminating any perception that genetic information gleaned from those tests (such as family medical history) could later be demanded from and/or used against them. Limiting "requests for [] protected health information to the minimum necessary to accomplish an intended purpose … is a key component of health information privacy." 410 ILCS 513/5(5).

54. The Illinois Legislature amended GIPA in 2008 to increase its protections and harmonize Illinois state law with the then-recently passed Federal Genetic Information Nondiscrimination Act of 2008 ("**GINA**"), 110 P.L. 233; *see also* 42 U.S.C. § 2000ff. The 2008 amendments to GIPA sought to further bar the practices of employers relating to the use of genetic information of employees, including such employees' family medical history.

55. During discussions of the 2008 GIPA amendments, the Illinois Legislature recognized the importance of safeguarding family medical history due to the fact that it is akin to knowledge of genetic predispositions:

> I hope the [legislature] understands the importance of [family medical history]; it's becoming more and more important. Back in '96 or '97, I had a third generation ovarian cancer survivor that came to me with this issue. … If a woman has … the gene that causes breast cancer, she can have up to an 84 percent probability that she will develop breast cancer sometime in her life … it's important that we help people be able to know that information and know they won't be discriminated against in their employment …. Quite honestly, with genetic information we have today, we could identify a pool of people that … no one would want to employ. [GIPA] helps guarantee that we don't have that kind of discrimination occur.

Illinois House Transcript, 2008 Reg. Sess. No. 276, pp. 33-34.

56.     GIPA bars companies such as Defendant from sharing genetic information with unauthorized third parties. Specifically, GIPA states: "Except as otherwise provided in this Act, genetic testing and information derived from genetic testing is confidential and privileged and may be released only to the individual tested and to persons specifically authorized, in writing in accordance with Section 30, by that individual to receive the information." 410 ILCS 513/15(a).

57.     GIPA further provides: "No person may disclose or be compelled to disclose the identity of any person upon whom a genetic test is performed or the results of a genetic test in a manner that permits identification of the subject of the test[.]" 410 ILCS 513/30(a).

58.     A company providing direct-to-consumer commercial genetic testing is prohibited from sharing any genetic test information or other personally identifiable information about a consumer with any health or life insurance company without written consent from the consumer. 410 ILCS 513/20(e).

59.     In order to enforce these and other requirements, GIPA provides individuals with a broad private right of action, stating: "Any person aggrieved by a violation of this Act shall have a right of action … against an offending party." 410 ILCS 513/40(a). Under this private right of action, a party may recover, for each violation: (a) $2,500 or actual damages, whichever is greater, for a negligent violation, or $15,000 or actual damages, whichever is greater, for a willful violation; (b) reasonable attorneys' fees; and (c) "[s]uch other relief, including an injunction, as the … court may deem appropriate." *Id.*

60.     Plaintiff is not required to allege or prove actual damages in order to state a claim under GIPA, and they can seek statutory damages under GIPA as compensation for the injuries caused by Defendant. *See Rosenbach v. Six Flags Ent. Corp.*, 2019 IL 123186, at ¶ 40, 432 Ill. Dec. 654, 129 N.E.3d 1197 (holding by the Illinois Supreme Court that "an individual need not

allege some actual injury or adverse effect, beyond violation of his or her rights under [the Illinois Biometric Privacy Act ("**BIPA**")] in order to qualify as an 'aggrieved person' under BIPA); *see also Bridges v. Blackstone Grp., Inc.*, 2022 U.S. Dist. LEXIS 121205, at *8 (S. D. Ill. July 8, 2022) (holding that it is appropriate to apply BIPA's definition of "aggrieved person" used by the *Rosenbach* court to alleged violations of GIPA).

61.     Thus, GIPA provides valuable privacy rights, protections, and benefits to the citizens of Illinois and provides those citizens with the means to aggressively enforce those rights.

## V.     FACTUAL ALLEGATIONS

### A. DEFENDANT'S USE OF THIRD-PARTY TRACKING TECHNOLOGIES

#### a. Google's Mass Advertising Surveillance Operation

62.     Google is the largest digital advertiser in the country, accounting for 26.8-percent of the total digital advertising revenue generated in the United States.[7] In 2023, Google's advertising revenue of $238 billion accounted for 77-percent of its total revenue for the year.[8]

63.     Google advertises Google Analytics and other Business Tools to website operators, like Defendant, claiming they will allow the operator to "[u]nderstand [their] site and app users," "check the performance of [their] marketing," and "[g]et insights only Google can give."[9] But, in

---

[7] *Share of major ad-selling companies in digital advertising revenue in the United States*, STATISTA (May 2024), https://www.statista.com/statistics/242549/digital-ad-market-share-of-major-ad-selling-companies-in-the-us-by-revenue/#:~:text=In%202023%2C%20Google%20accounted%20for,21.1%20and%2012.5%20percent%2C%20respectively https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last accessed Jan. 5, 2025).

[8] Florian Zandt, *Google's Ad Revenue Dwarfs Competitors*, STATISTA (Sep. 10, 2024), https://www.statista.com/chart/33017/annual-advertising-revenue-of-selected-tech-companies-offering-search-solutions/#:~:text=Online%20advertising&text=Alphabet%2C%20the%20company%20behind%20the,overall%20revenue%20this%20past%20year (last accessed Jan. 5, 2025).

[9]       *Welcome to Google Analytics*, GOOGLE, https://analytics.google.com/analytics/web/provision/?authuser=0#/provision (last accessed Jan. 5, 2025).

order for website operators to get information from Google Analytics about their website's visitors, they must allow data collection through installation of Google's Tracking Tools on their website.[10]

64.     Indeed, on its *Privacy & Terms* page, Google admits that it collects information from third party websites, stating that: "[m]any websites and apps use Google services to improve their content and keep it free. When they integrate our services, these sites and apps share information with Google."[11]

65.     Google also admits that it uses the information collected from third party websites, such as Defendant's, to sell targeted advertising, explaining to users that: "[f]or example, a website that sells mountain bikes might use Google's ad services. After you visit that site, you could see an ad for mountain bikes on a different site that shows ads served by Google."[12]

66.     While Google admits that it collects information from third-party websites through the Tracking Tools, it does not provide, nor could it provide, a publicly available list of every webpage on which its Tracking Tools are installed. As such, the vague descriptions of Google's data collection practices referenced above could not give Plaintiffs and Class Members any reason to think that Defendant was part of Google's surveillance network. Moreover, as Defendant does not disclose its use of Google's Tracking Tools, Plaintiffs and Class Members could not have been reasonably expected to review any of Google's privacy statements in connection with their use of the Website

---

[10] *See* Aaron Ankin & Surya Matta, *The High Privacy Cost of a "Free" Website*, THE MARKUP, https://themarkup.org/blacklight/2020/09/22/blacklight-tracking-advertisers-digital-privacy-sensitive-websites (last accessed Jan. 5, 2025).

[11] *Privacy & Terms – How Google uses information from sites or apps that use our services*, GOOGLE, https://policies.google.com/technologies/partner-sites (last accessed Jan. 5, 2025).

[12] *Id.*

67.     Google aggregates the user information that it collects from third-party websites into 'advertising profiles' consisting of all of the data that it has collected about a given user.[13] With these advertising profiles, Google can sell hyper-precise advertising services, allowing its clients to target internet users based on combinations of their location, age, race, interests, hobbies, life events (e.g., recent marriages, graduation, or relocation), political affiliation, education level, home ownership status, marital status, household income, type of employment, use of specific apps or websites, and more.[14]

68.     Google's surveillance of individual's internet usage is ubiquitous. In 2017, Scientific American reported that over 70-percent of smartphone apps report "personal data to third-party tracking companies like Google,"[15] and Google trackers are present on 74-percent of all web traffic.

69.     Moreover, as in this case, the data collected by Google often pertains to the most personal and sensitive aspects of an individual's life. For example:

i.      93-percent of pornography websites allow third parties, including Google, to collect their user's browsing habits.[16] In fact, Google advertising trackers were found on 73-percent of pornography websites.[17]

---

[13] Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive Into the Technology of Corporate Surveillance*, ELECTRONIC FRONTIER FOUNDATION (2019), *available online at*: https://www.eff.org/files/2019/12/11/behind_the_one-way_mirror-a_deep_dive_into_the_technology_of_corporate_surveillance_0.pdf.

[14] *About audience segments*, GOOGLE ADS, https://support.google.com/google-ads/answer/2497941?hl=en#zippy=%2Cin-market-segments%2Caffinity-segments%2Clife-events%2Cdetailed-demographics (last accessed Jan. 5, 2025).

[15] Narseo Vallina-Rodriguez & Srikanth Sundaresan, *7 in 10 Smartphone Apps Share Your Data with Third-Party Services*, SCIENTIFIC AMERICAN (May 30, 2017), https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last accessed Jan. 5, 2025).

[16] Elena Maris, Timothy Libert & Jennifer R. Henrichsen, *Tracking sex: The implications of widespread sexual data leakage and tracking on porn websites*, NEW MEDIA & SOCIETY (2020), *available online at*: https://journals.sagepub.com/doi/10.1177/1461444820924632.

[17] *Id.*

ii. 81-percent of the most popular mobile apps for managing depression and quitting smoking allowed Facebook and/or Google to access subscriber information, including health diary entries and self-reports about substance abuse.[18]

iii. Twelve of the largest pharmacy providers in the United States send information regarding user's purchases of products such as pregnancy tests, HIV tests, prenatal vitamins, and Plan B to online advertisers.[19] For example, when an online shopper searches for a pregnancy test, views the product page for a pregnancy test, or adds a pregnancy test to their online shopping cart on Kroger's website, that information is transmitted to Google.[20]

70. This monumental, invasive surveillance of Americans' internet usage is not accidental. As Google's then-CEO Eric Schmit admitted in 2010: "We know where you are. We know where you've been. We can more or less know what you're thinking about."[21]

71. In fact, Google values user information so highly that it provides its Business Tools to many website operators for free, all to expand its surveillance apparatus.[22]

72. When website operators, like Defendant, make use of Google's Business Tools, they are essentially choosing to participate in Google's mass surveillance network, and in return they benefit from Google's collection of user data, at the expense of their website users' privacy. For example, Google rewards website operators for providing it with their user's information by

---

[18] Kit Huckvale, John Torous & Mark E. Larsen, *Assessment of the Data Sharing and Privacy Practices of Smartphone Apps for Depression and Smoking Cessation*, JAMA NETWORK OPEN (2019), *available online at*: https://pubmed.ncbi.nlm.nih.gov/31002321/.

[19] Darius Tahir & Simon Fondrie-Teitler*, Need to Get Plan B or an HIV Test Online? Facebook May Know About It*, THE MARKUP (June 30, 2023), https://themarkup.org/pixel-hunt/2023/06/30/need-to-get-plan-b-or-an-hiv-test-online-facebook-may-know-about-it (last accessed Jan. 5, 2025).

[20] Jon Keegan, *Forget Milk and Eggs: Supermarkets Are Having a Fire Sale on Data About You*, THE MARKUP (Feb. 16, 2023), https://themarkup.org/privacy/2023/02/16/forget-milk-and-eggs-supermarkets-are-having-a-fire-sale-on-data-about-you (last accessed Jan. 5, 2025).

[21] Andrew Orlowski, *Google's Schmidt: We know what you're thinking*, THE REGISTER (Oct. 4, 2020), https://www.theregister.com/2010/10/04/google_ericisms/ (last accessed Jan. 5, 2025).

[22] *Analytics Overview*, GOOGLE, https://marketingplatform.google.com/about/analytics/ (last accessed Jan. 5, 2025) ("Google Analytics gives you the tools, free of charge"),

granting access to its Analytics platform, which leverages demographic data collected by Google to provide detailed analyses of the website's user base.[23]

73.    In many cases, a website operator's use of third-party tracking software is not disclosed whatsoever in its privacy policy.[24] Even where the use of such third-party software is disclosed, such disclosures are often hidden and cloaked in such confusing, technical and overly legal language as to be indecipherable to the typical internet user.[25]

74.    Moreover, for even a conscientious internet user, the massive volume of privacy policies encountered through routine internet use makes reviewing each and every one practically impossible. According to one study, it would take the average internet user 244 hours – or 30.5 working days – to read the privacy policy of every new website that they visited in a single year.[26]

**b.    Pixels Can Record Almost Every Interaction Between a User and a Website**

75.    In order to use Google's Business Tools, Defendant installed Google's Tracking Tools, including tracking Pixels, onto its website.

76.    Pixels are one of the tools used by website operators to track user behavior. As the Federal Trade Commission ("FTC") explains, a Pixel is:

> [A] small piece of code that will be placed into the website or ad and define [the Pixel operator's] tracking goals such as purchases, clicks, or pageviews…
>
> Pixel tracking can be monetized several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns…Another is that companies can monetize the data collected

---

[23]    *Google Marketing Platform – Features*, GOOGLE, https://marketingplatform.google.com/about/analytics/features/ (last accessed Jan. 5, 2025).

[24] *See* Woodrow Hartzog, *Privacy's Blueprint*, 60-67 (Harvard University Press 2018) (detailing deficiencies with online privacy policies).

[25] *Id*.

[26] Aleecia M. McDonald & Lorrie Faith Cantor, *The Cost of Reading Privacy Policies*, I/S: A JOURNAL OF LAW AND POLICY FOR THE INFORMATION SOCIETY (2008), *available online at*: https://lorrie.cranor.org/pubs/readingPolicyCost-authorDraft.pdf.

by further optimizing their own ad targeting systems and charging other companies to use its advertising offerings.[27]

77.    Pixels can collect a shocking amount of information regarding an individual's online behavior, including the webpages viewed by the user, the amount of time spent by the user on specific webpages, the buttons and hyperlinks that the user clicks while using a website, the items that the user adds to an online shopping cart, the purchases that a user makes through an online retailer, the text entered by the user into a website search bar, and even the information provided by the user on an online form.[28]

78.    But most internet users are completely unaware that substantial information about their internet usage is being collected through tracking Pixels. The FTC warns that:

> Traditional controls such as blocking third party cookies may not entirely prevent pixels from collecting and sharing information. Additionally, many consumers may not realize that tracking pixels exist because they're invisibly embedded within web pages that users might interact with…Academic and public reporting teams have found that thousands of the most visited webpages have pixels and other methods that leak personal information to third parties.[29]

### c.    The Pixels Installed on Defendant's Website Transmit Personally Identifiable Information to Google

79.    Every website is hosted by a computer "server" that holds the website's contents.

80.    To access a website, individuals use "web browsers." Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic

---

[27] *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FEDERAL TRADE COMMISSION – OFFICE OF TECHNOLOGY (Mar. 6, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking (last accessed Jan. 5, 2025).

[28] *See id.*; *How does retargeting on Facebook help your business?*, META, https://www.facebook.com/business/goals/retargeting (last accessed Jan. 5, 2025); Tom Kemp, *"Oops! I Did It Again" … Meta Pixel Still Hoovering Up Our Sensitive Data*, MEDIUM, https://tomkemp00.medium.com/oops-i-did-it-again-meta-pixel-still-hoovering-up-our-sensitive-data-f99c7b779d47#_ftn1 (last accessed Jan. 5, 2025).

[29] *Lurking Beneath the Surface, supra* note 27.

information and communications over the Internet. Each "client device" (such as computer, tablet, or smartphone) accesses web content through a web browser (such as Google's Chrome, Mozilla's Firefox, Apple's Safari, or Microsoft's Edge).

81. Communications between a website server and web browser consist of Requests and Responses. Any given browsing session may consist of hundreds or even thousands of individual Requests and Responses. A web browser's Request essentially asks the website to provide certain information, such as the contents of a given webpage when the user clicks a link, and the Response from the website sends back the requested information – the web pages' images, words, buttons, and other features that the browser shows on the user's screen as they navigate the website.

82. Additionally, on most websites, the Response sent back to the user's web browser directs the browser to create small files known as 'cookies' on the user's device.[30] These cookies are saved by the user's web browser, and are used to identify the website user as they browse the website or on subsequent visits to the site.[31] For example, in a more innocuous use case, a cookie may allow the website to remember a user's name and password, language settings, or shopping cart contents.[32]

83. When a Google user logs onto their account, their web browser records a Google tracking cookie.[33] This cookie include a specific line of code that links the web browser to the user's Google account.[34]

---

[30] *What is a web browser?*, MOZILLA, https://www.mozilla.org/en-US/firefox/browsers/what-is-a-browser/ (last visited Nov. 25, 2024).

[31] *Id*.

[32] *Id*.

[33] Cyphers, *supra* note 13.

[34] *Id*.

84.     Google's Pixels use cookies, but operate differently than a cookie.  Rather than directing the browser to save a file on the user's device, the Pixels acquires information from the browser, without notifying the user.  The information can include details about the user, his or her interactions with the Website, and information about the user's environment (*e.g.,* type of device, type of browser, and sometimes even the physical location of the device), all relayed contemporaneously as the Website user navigates the Website.

85.     Simultaneously, the Google Pixels, like those installed on Defendant's Website, request identifying information from any Google cookies previously installed on the user's web browser.

86.     The Pixel then combines the data it received from the browser with the data it acquired from the cookie, and instructs the web browser to transmit the information back to Google. As a result, Google can link all of the user information collected by their Pixels on the Defendant's Website to the user's identity, via the user's Google profile.  Thus, even if a user never actually logs into a website, or fills out a form, the website, along with Google, can know the user's identity.

87.     A remarkable number of Americans possess a Google account. Just one of Google's many products, its Gmail e-mail client, is used by over one-third of Americans.[35] When these users visit a website, like Defendant's, that utilizes a Google Pixel, any information collected by the Pixel can be linked to the user's identity through the Google cookies installed on the user's web browser.

---

[35] *See* Harsha Kiran, *49 Gmail Statistics To Show How Big It Is In 2024*, TECHJURY (Jan. 3, 2024), https://techjury.net/blog/gmail-statistics/ (last accessed Jan. 5, 2025) ("Gmail accounts for 130.9 million of the total email users in the US"). The United States population is approximately 337.4 million. *See* UNITED STATES CENSUS BUREAU, https://www.census.gov/popclock/ (last accessed Jan. 5, 2025).

88.     However, it is not only Google account holders that are at risk of having Pixel-collected website data linked to their identities. Rather, Google utilizes sophisticated data tracking methods to identify even those few users who do not have a Google account.

89.     Google's Pixels, like those on Defendant's website, can acquire information about the user's device and browser, such as their screen resolution, time zone setting, browser software type and version, operating system type and version, language setting, and IP address.

90.     An internet user's combination of such device and browser characteristics, commonly referred to as their "browser fingerprint," is "often unique."[36] By tracking this browser fingerprint, Google is able to compile a user's activity across the internet.[37] And, as Google continuously compiles user data over time, its understanding of the user's browser fingerprint becomes more sophisticated such that it needs only to collect a single piece of identifying information to identify the user linked to a browser fingerprint.

**d.  Defendant Disclosed Plaintiffs' and Class Members' Genetic Testing Information to Google**

91.     Defendant's genetic testing service uses genomic testing to generate information on a customer's ancestry, ancestral origin, DNA relatives, and health traits and predispositions. To use Defendant's genetic testing service, consumers purchase one of Defendant's test kits through its Website or a third-party retailer, and provide a saliva sample to the Defendant for its analysis.

92.     To receive their genetic testing results, Defendant's customers, like Plaintiffs and Class Members, are required to register on Defendant's Website. When Defendant completes its genetic analysis, Defendant's customers must log into its Website portal to view their genetic testing results.

---

[36] Cyphers, *supra* note 13.

[37] *Id.*

93.     Defendant's genetic test provides Defendant's customers with several different data points, including their ancestral ethnicity groups, and identification of potential relatives who have also taken a MyHeritage genetic test.

94.     Unbeknownst to Plaintiffs and Class Members, Defendant intentionally configured the Pixels installed on its Website to simultaneously and contemporaneously capture and transmit their genetic testing results to unauthorized third parties, including Google.

95.     For example, the following screenshot ("Figure 1") depicts network transmission data captured from the Website, and shows that when Defendant's customers, including Plaintiffs and Class Members, view their DNA match analysis, the information requested and transmitted to Google by the Pixels installed on Defendant's website include the fact that the customer is viewing their "DNA Results," as well as their last name (in this case, "Singh").

96.     Further, the information transmitted to Google was accompanied by specific lines of code linking the information transmitted to Google to the user's identity. As Figure One shows, Defendant's website transmitted the identifier number attached to Google's '_cid', '_uid', and '_gid' cookies, which identify the user's Google account. Defendant's website also transmitted information that is commonly used to create a browser fingerprint, such as the user's language selection, screen resolution, physical location, and IP address information.



*Figure 1. Screenshot[38] depicting back-end network traffic from Defendant's Website which show information transmitted to Google.*

97.     Likewise, when Defendant's customers view their ancestry analysis, Defendant's website transmits the results of their genetic test to Google. As the following screenshot ("Figure 2") shows, when Defendant's customers view their ancestry analysis, Defendant's website transmits the user's result to Google – in this case, the user's designation as belonging to the 'South Asian' genetic group. Along with the user's ancestry designation, Defendant also transmitted the identifying information linked to Google's '_cid', '_uid' and '_gid' cookies, the user's last name,

---

[38] Figure 1 consists of the top and bottom halves of a single screenshot, displayed side-by-side to enhance readability. When viewed on an internet browser, the network transmission records depicted appear as a contiguous list.

and information commonly used to generate a browser fingerprint, such as the user's language

selection, screen resolution, location, and IP address information.



*Figure 2. Screenshot depicting back-end network traffic from Defendant's Website which shows information transmitted to Google.*

98.     By installing third-party Tracking Tools, including tracking Pixels, on its Website, Defendant knowingly and intentionally caused Plaintiffs' and Class Members' Genetic Testing Information to be transmitted to third parties, including Google.

**B. DEFENDANT DISCLOSED PLAINTIFFS' AND CLASS MEMBERS' SENSITIVE INFORMATION TO THIRD PARTIES WITHOUT THEIR KNOWLEDGE OR CONSENT**

    **a. Defendant failed to inform Plaintiffs' and Class Members' of its disclosure of their Genetic Testing Information to Third Parties, in violation of its Privacy Statement.**

99.     Defendant's Privacy Statement informs its customers, that "MYHERITAGE HAS NEVER SOLD OR LICENSED GENETIC DATA OR HEALTH DATA, AND WILL NEVER DO SO IN THE FUTURE" and that "MyHeritage has never sold or licensed personal data (like customer names, email addresses, residence addresses and family trees) and will never do so in the future."[39]

100.    These statements were lies. In truth, Defendant breached Plaintiffs' and Class Members' right to privacy by unlawfully disclosing their Genetic Testing Information to third parties, including Google.

101.    Plaintiffs and Class Members had a reasonable expectation of privacy, based partly on Defendant's own representations to Plaintiffs and the Class, that Defendant would not disclose their Genetic Testing Information to third parties. Defendant did not inform Plaintiffs that it was sharing their Genetic Testing Information with third parties, including Google.

102.    Plaintiffs relied on Defendant's Privacy Statement when deciding to purchase its DTC genetic testing products, use its Website, and entrust it with their Genetic Testing Information.

---

[39] *Privacy Policy*, MYHERITAGE, https://www.myheritage.com/privacy-policy (last visited Jan. 5, 2025).

103.     By engaging in this improper sharing of their Genetic Testing Information without Plaintiffs' and Class Members' consent, Defendant violated its own Privacy Statement and breached Plaintiffs' and Class Members' right to privacy, including under GIPA, by unlawfully disclosing their use of its genetic testing service and the results of their genetic testing.

104.     Despite never telling users like Plaintiffs and Class Members, Defendant allowed third parties such as Google and Facebook to intercept Plaintiffs' and Class Members' Genetic Testing Information and use it for advertising purposes.

## C.  DEFENDANT WAS ENRICHED BY ITS DISCLOSURE OF PLAINTIFFS' AND CLASS MEMBERS' SENSITIVE INFORMATION TO THIRD PARTIES

### a.  Defendant Received Material Benefits in Exchange for Plaintiffs' Genetic Testing Information

105.     As explained, *supra*, users of Google's Business Tools, like Defendant, receive access to advertising and marketing analytics services in exchange for installing Google's Tracking Tools on their website.

106.     Upon information and belief, Defendant, as a user of Google's Business Tools, received compensation in the form of advanced advertising services and cost-effective marketing on third-party platforms in exchange for allowing Google to collect Plaintiffs' and Class Members' Genetic Testing Information.

### b.  Plaintiffs' and Class Members' Data Had Financial Value

107.     Moreover, Plaintiffs' and Class Members' Genetic Testing Information had value and Defendant's disclosure and interception of that Genetic Testing Information harmed Plaintiff and the Class.

108.     According to the financial statements of Facebook, another major seller of online advertisements, the value derived from user data has continuously risen. "In 2013, the average

American's data was worth about $19 per year in advertising sales to Facebook, according to its financial statements. In 2020, [it] was worth $164 per year."[40]

109. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

110. Several companies have products through which they pay consumers for a license to track certain information. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing history information.

111. The unauthorized disclosure of Plaintiffs' and Class Members' private and Genetic Testing Information has diminished the value of that information, resulting in harm including Plaintiffs and Class Members.

### D. PLAINTIFFS' AND CLASS MEMBERS' REASONABLE EXPECTATION OF PRIVACY

112. At all times when Plaintiffs and Class Members provided their Genetic Testing Information to Defendant, they each had a reasonable expectation that the information would remain confidential and that Defendant would not share their Genetic Testing Information with third parties for a commercial purpose, unrelated to providing the DNA analysis that Plaintiffs and Class Members contracted with Defendant to receive.

113. Privacy polls and studies show that an overwhelming majority of Americans consider obtaining an individual's affirmative consent before a company collects and shares that individual's data to be one of the most important privacy rights.

---

[40] Geoffrey A. Fowler, *There's no escape from Facebook, even if you don't use it*, THE WASHINGTON POST (Aug. 29, 2021), https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/ (last accessed Jan. 5, 2025).

114.    For example, a recent Consumer Reports study shows that 92-percent of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[41]

115.    With regards to genetic testing specifically, the top two factors that Americans state as being important in making the "decision to participate in genetic research" are "[c]onfidentiality: knowing that your information will not be shared without your consent" and "[p]rivacy: knowing that your information will not be shared publicly.[42] In fact, more than half of Americans believe that the results of DTC genetic testing should not even be shared with law enforcement for the purpose of helping to solve crimes.[43]

116.    Personal data privacy and obtaining consent to share Genetic Testing Information are material to Plaintiffs and Class Members.

## VI.    TOLLING AND ESTOPPEL

117.    Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of its incorporation of Google's Tracking Tools into its website.

118.    The Pixels and other tracking tools on Defendant's Website were and are invisible to the average website visitor.

---

[41] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907 (last visited Nov. 12, 2024).

[42] *U.S. Public Views of Genetics: An ASHG Survey*, AMERICAN SOCIETY OF HUMAN GENETICS (Jan. 29, 2020), *available online at*: https://www.ashg.org/discover-genetics/public-views-of-genetics-survey/.

[43] Andrew Perrin, *About half of Americans are OK with DNA testing companies sharing user data with law enforcement*, PEW RESEARCH (Feb. 4, 2020), https://www.pewresearch.org/short-reads/2020/02/04/about-half-of-americans-are-ok-with-dna-testing-companies-sharing-user-data-with-law-enforcement/ (last accessed Jan. 5, 2025).

119.    Through no fault or lack of diligence, Plaintiffs and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

120.    Plaintiffs were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

121.    Defendant had exclusive knowledge that its Website incorporated the Pixels and other Tracking Tools and yet failed to disclose to customers, including Plaintiffs and Class Members, that by applying for loans through Defendant's Website, Plaintiffs' and Class Members' Genetic Testing Information would be disclosed or released to unauthorized third parties, including Google.

122.    Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its customers' Genetic Testing Information. In fact, to the present Defendant has not conceded, acknowledged, or otherwise indicated to its customers that it has disclosed or released their Genetic Testing Information to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

123.    Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

124.    The earliest that Plaintiffs or Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of this Complaint.

## VII.    TOLLING AND ESTOPPEL

125.    Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of its incorporation of Google and Facebook's Tracking Tools into its Website.

126.    The Pixels and other tracking tools on Defendant's Website were and are invisible to the average website visitor.

127.    Through no fault or lack of diligence, Plaintiffs and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

128.    Plaintiffs were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

129.    Defendant had exclusive knowledge that its Website incorporated the Pixels and other Tracking Tools and yet failed to disclose to customers, including Plaintiffs and Class Members, that by viewing their genetic testing results through Defendant's Website, Plaintiffs' and Class Members' Genetic Testing Information would be disclosed or released to unauthorized third parties, including Google and Facebook.

130.    Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its customers' Genetic Testing Information. In fact, to the present Defendant has not conceded, acknowledged, or otherwise indicated to its customers that it has disclosed or released their Genetic Testing Information to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

131.    Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

132.    The earliest that Plaintiffs or Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of this Complaint.

## CLASS ACTION ALLEGATIONS

133.    The Nationwide Class that Plaintiffs seek to represent is defined as follows:

### The Nationwide Class

All natural persons who used Defendant's Website to view their genetic testing results and whose Genetic Testing Information was disclosed or transmitted to Google or any other unauthorized third party.

134.    In addition to the claims asserted on behalf of the Nationwide Class, Plaintiffs assert claims on behalf of a separate Illinois Subclass and New Jersey Subclass, which are defined as follows:

### Illinois Subclass

All natural persons residing in Illinois who used Defendant's Website to view their genetic testing results and whose Genetic Testing Information was disclosed or transmitted to Google or any other unauthorized third party.

### New Jersey Subclass

All natural persons residing in Illinois who used Defendant's Website to view their genetic testing results and whose Genetic Testing Information was disclosed or transmitted to Google or any other unauthorized third party.

135.    Excluded from the proposed Class are any claims for personal injury, wrongful death, or other property damage sustained by the Class; and any Judge conducting any proceeding in this action and members of their immediate families.

136.    Plaintiffs reserve the right to amend the definitions of the Class or add subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

137.    **Numerosity.** The Class is so numerous that the individual joinder of all members is impracticable. There are at least 10,000 individuals that have been impacted by Defendant's actions. Moreover, the exact number of those impacted is generally ascertainable by appropriate discovery and is in the exclusive control of Defendant.

138.    **Commonality.** Common questions of law or fact arising from Defendant's conduct exist as to all members of the Class, which predominate over any questions affecting only individual Class Members. These common questions include, but are not limited to, the following:

a)    Whether and to what extent Defendant had a duty to protect the Genetic Testing Information of Plaintiffs and Class Members;

b)    Whether Defendant had duties not to disclose the Genetic Testing Information of Plaintiffs and Class Members to unauthorized third parties;

c)    Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their Genetic Testing Information would be disclosed to third parties;

d)    Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their Genetic Testing Information was being disclosed without their consent;

e)    Whether Defendant adequately addressed and fixed the practices which permitted the unauthorized disclosure of patients' Genetic Testing Information;

f)    Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to keep the Genetic Testing Information belonging to Plaintiffs and Class Members free from unauthorized disclosure;

g)    Whether Defendant violated the statutes asserted as claims in this Complaint;

h)    Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

i)    Whether Defendant knowingly omitted material representations with respect to their data security and/or privacy policy practices; and

j)    Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendant's disclosure of their Genetic Testing Information.

139. **Typicality.** Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Genetic Testing Information, like that of every other Class Member, was compromised as a result of Defendant's incorporation and use of the Tracking Tools.

140. **Adequacy.** Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

141. **Predominance.** Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members in that all the Plaintiffs' and Class Members' data was unlawfully stored and disclosed to unauthorized third parties, including third parties, including Google and Facebook, in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

142. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management

difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

143.    Defendant acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

144.    Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a)  Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Genetic Testing Information and not disclosing it to unauthorized third parties;

b)  Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Genetic Testing Information;

c)  Whether Defendant failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

d)  Whether Defendant adequately and accurately informed Plaintiffs and Class Members that their Genetic Testing Information would be disclosed to third parties;

e)  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties;

f)  Whether Class Members are entitled to actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendant's wrongful conduct.

145.    Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the unauthorized disclosures that have taken place.

**COUNT I**
**VIOLATIONS OF ILLINOIS GENETIC INFORMATION PRIVACY ACT**
**410 ILCS 513/15**
**FAILURE TO MAINTAIN CONFIDENTIALITY OF GENETIC INFORMATION**
*(On Behalf of Plaintiff Carter and the Illinois Subclass)*

146.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 145 as if fully set forth herein.

147.    Plaintiff Carter and Illinois Subclass Members were asked to provide, and did provide, her genetic information to Defendant for the purpose of a genetic test.

148.    Defendant, or an agent acting on its behalf, released information derived from Plaintiff Carter's and Illinois Subclass Members genetic tests to unauthorized third parties for the purpose of sending Plaintiff targeted advertisements.

149.    Defendant, or an agent acting on its behalf, disclosed the results of their genetic tests in a manner that permitted identification of Plaintiff Carter and Illinois Subclass Members to unauthorized third parties, for the purpose of sending Plaintiff Carter and Illinois Subclass Members targeted advertisements.

150.    Plaintiff Carter and Illinois Subclass Members did not provide specific written authorization for Defendant to share information derived from Plaintiff Carter's and Illinois Subclass Members' genetic tests with any third party.

151.    Plaintiff Carter and Illinois Subclass Members were aggrieved by Defendant's violations of their statutorily protected rights to privacy in their genetic information, as set forth in GIPA, when Defendant disclosed information derived from their genetic tests with unauthorized

third parties in a manner that permitted the third parties to identify the subject of the genetic test results.

152.     By disclosing information derived from the genetic tests of Plaintiff Carter and Illinois Subclass Members with unauthorized third parties as described herein, Defendant violated Plaintiff Carter's and Illinois Subclass Members' rights to privacy in their genetic information as set forth in GIPA.

153.     Because Defendant knew, or reasonably should have known, that disclosing information derived from the genetic tests of Plaintiff Carter and Illinois Subclass Members with unauthorized third parties violated GIPA, its actions in violating GIPA were willful.

154.     On behalf of herself and the proposed Illinois Subclass Members, Plaintiff Carter seeks: (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the proposed Class by requiring Defendant to comply with GIPA as described herein; (3) statutory damages of $15,000 or actual damages, whichever is greater, for each intentional and/or reckless violation of GIPA pursuant to 410 ILCS 513/40(2) or, in the alternative, statutory damages of $2,500 or actual damages, whichever is greater, for each negligent violation of GIPA pursuant to 410 ILCS 513/40(1); and (4) reasonable attorneys' fees and costs and other litigation expenses pursuant to 410 ILCS 513/40(3).

## COUNT II
**VIOLATIONS OF ILLINOIS GENETIC INFORMATION PRIVACY ACT**
**410 ILCS 513/30**
**UNAUTHORIZED DISCLOSURE OF GENETIC TEST RESULTS AND IDENTITIES**
***(On Behalf of Plaintiff Carter and the Illinois Subclass)***

155.     Plaintiffs repeat and reallege the allegations contained in paragraphs 146 through 154 as if fully set forth herein.

156.     Plaintiff Carter and Illinois Subclass Members were asked to provide, and did provide, her genetic information to Defendant for the purpose of a genetic test.

157.     Defendant, or an agent acting on its behalf, released information derived from Plaintiff Carter's and Illinois Subclass Members genetic tests to unauthorized third parties for the purpose of sending Plaintiff targeted advertisements.

158.     Defendant, or an agent acting on its behalf, disclosed the results of their genetic tests in a manner that permitted identification of Plaintiff Carter and Illinois Subclass Members to unauthorized third parties, for the purpose of sending Plaintiff Carter and Illinois Subclass Members targeted advertisements.

159.     Plaintiff Carter and Illinois Subclass Members did not provide specific written authorization for Defendant to share information derived from Plaintiff Carter's and Illinois Subclass Members' genetic tests with any third party.

160.     Plaintiff Carter and Illinois Subclass Members were aggrieved by Defendant's violations of their statutorily protected rights to privacy in their genetic information, as set forth in GIPA, when Defendant disclosed information derived from their genetic tests with unauthorized third parties in a manner that permitted the third parties to identify the subject of the genetic test results.

161.     By disclosing information derived from the genetic tests of Plaintiff Carter and Illinois Subclass Members with unauthorized third parties as described herein, Defendant violated Plaintiff Carter's and Illinois Subclass Members' rights to privacy in their genetic information as set forth in GIPA.

162. Because Defendant knew, or reasonably should have known, that disclosing information derived from the genetic tests of Plaintiff Carter and Illinois Subclass Members with unauthorized third parties violated GIPA, its actions in violating GIPA were willful.

163. On behalf of herself and the proposed Illinois Subclass Members, Plaintiff Carter seeks: (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the proposed Class by requiring Defendant to comply with GIPA as described herein; (3) statutory damages of $15,000 or actual damages, whichever is greater, for each intentional and/or reckless violation of GIPA pursuant to 410 ILCS 513/40(2) or, in the alternative, statutory damages of $2,500 or actual damages, whichever is greater, for each negligent violation of GIPA pursuant to 410 ILCS 513/40(1); and (4) reasonable attorneys' fees and costs and other litigation expenses pursuant to 410 ILCS 513/40(3).

### COUNT III
### COMMON LAW INVASION OF PRIVACY - INTRUSION UPON SECLUSION
#### *(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the Illinois and/or New Jersey Subclass(es))*

164. Plaintiffs repeat and reallege the allegations contained in paragraphs 155 through 163 as if fully set forth herein.

165. Plaintiffs and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, highly personal Sensitive Information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to the exfiltration of their communications without Plaintiffs' and Class Members' knowledge or consent.

166. Plaintiffs and Class Members had a reasonable expectation of privacy in their communications with Defendant via its Website and the communications platforms and services

therein.

167.    Plaintiffs and Class Members communicated Sensitive Information that they intended for only Defendant to receive and that they understood Defendant would keep private and secure.

168.    Defendant's disclosure of the substance and nature of those communications to third parties without the knowledge and informed consent of Plaintiffs and Class Members is an intentional intrusion on Plaintiffs' and Class Members' solitude or seclusion.

169.    Plaintiffs and Class Members had a reasonable expectation of privacy given Defendant's Privacy Policy and other representations.

170.    Moreover, Plaintiffs and Class Members have a general expectation that their communications regarding sensitive, highly personal information would be protected from surreptitious disclosure to third parties.

171.    Defendant's disclosure of Plaintiffs' and Class Members' Sensitive Information coupled with individually identifying information is highly offensive to the reasonable person.

172.    As a result of Defendant's actions, Plaintiffs and Class Members have suffered harm and injury including, but not limited to, an invasion of their privacy rights.

173.    Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to compensatory and/or nominal damages.

174.    Plaintiffs and Class Members seek appropriate relief for that injury including, but not limited to, damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as a result of the intrusions upon their privacy.

175.    Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful and intentional nature of Defendant's actions, directed at injuring Plaintiffs

and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

176.    Plaintiffs also seek such other relief as the Court may deem just and proper.

## COUNT IV
## BREACH OF CONFIDENCE
### *(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the Illinois and/or New Jersey Subclass(es))*

177.    Plaintiffs repeat and reallege the allegations contained in paragraphs 164 through 176 as if fully set forth herein.

178.    Providers of genetic testing have a duty to their clients to keep non-public genetic information completely confidential.

179.    Plaintiffs and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Website.

180.    Plaintiffs' and Class Members' reasonable expectations of privacy in the communications exchanged with Defendant were further buttressed by Defendant's express promises in its Privacy Statement.

181.    Contrary to its duties as a genetic testing provider and its express promises of confidentiality, Defendant deployed the Tracking Technologies to disclose and transmit Plaintiffs' and Class Members' Genetic Testing Information and the contents of their communications exchanged with Defendant to third parties.

182.    The third-party recipients included, but were not limited to, Google, Facebook and other online marketers.

183.    Defendant's disclosures of Plaintiffs' and Class Members' Genetic Testing Information were made without their knowledge, consent or authorization, and were unprivileged.

184.    The harm arising from a breach of confidentiality includes erosion of the essential confidential relationship between the genetic testing provider and client.

185.    As a direct and proximate cause of Defendant's unauthorized disclosures of their personally identifiable, non-public Genetic Testing Information, Plaintiffs and Class Members in that:

    a.   Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

    b.   Defendant eroded the essential confidential nature of the testee-tester relationship;

    c.   Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without compensating Plaintiffs and Class Members for the data;

    d.   Plaintiffs and Class Members did not get the full value of the testing services for which they paid, which included Defendant's duty to maintain confidentiality;

    e.   Defendant's actions diminished the value of Plaintiffs' and Class Members' Genetic Testing Information, and

    f.   Defendant's actions violated the property rights Plaintiffs and Class Members have in their Genetic Testing Information.

186.    Plaintiffs and Class Members are therefore entitled to general damages for invasion of their rights in an amount to be determined by a jury and nominal damages for each independent violation. Plaintiffs are also entitled to punitive damages.

## COUNT V
## NEGLIGENCE
### *(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the Illinois and/or New Jersey Subclass(es))*

187.    Plaintiffs repeat and reallege the allegations contained in in paragraphs 177 through 186 as if fully set forth herein.

188.     Through using Defendant's Website, Plaintiffs and Class Members provided it with their Sensitive Information.

189.     By collecting and storing this data, Defendant had a duty of care to use reasonable means to secure and safeguard it from unauthorized disclosure to third parties.

190.     Defendant negligently failed to take reasonable steps to protect Plaintiffs' and Class Members' Sensitive Information from being disclosed to third parties, without their consent, including to Google.

191.     Defendant further negligently omitted to inform Plaintiffs and the Class that it would use their Sensitive Information for marketing purposes, or that their Sensitive Information would be transmitted to third parties.

192.     Defendant knew, or reasonably should have known, that Plaintiffs and the Class would not have provided their Sensitive Information to Defendant, had Plaintiffs and the Class known that Defendant intended to use that information for unlawful purposes.

193.     Defendant's conduct has caused Plaintiffs and the Class to suffer damages by having their highly personal, personally identifiable Sensitive Information accessed, stored, and disseminated without their knowledge or consent.

194.     Plaintiffs and Class Members are entitled to compensatory, nominal, and/or punitive damages.

195.     Defendant's negligent conduct is ongoing, in that it still holds the Sensitive Information of Plaintiffs and Class Members in an unsafe and unsecure manner. Therefore, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all

Class Members.

## COUNT VI
## BREACH OF IMPLIED CONTRACT
### *(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the Illinois and/or New Jersey Subclasses)*

196.    Plaintiffs repeat and reallege the allegations contained in paragraphs 187 through 195 as if fully set forth herein.

197.    When Plaintiffs and Class Members provided their Sensitive Information to Defendant in exchange for services, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their Sensitive Information without consent.

198.    Plaintiffs and Class Members accepted Defendant's offers and provided their Sensitive Information to Defendant.

199.    Plaintiffs and Class Members would not have entrusted Defendant with their Sensitive Information in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Sensitive Information without consent.

200.    Defendant breached these implied contracts by disclosing Plaintiffs' and Class Members' Sensitive Information to third parties like Google.

201.    As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiffs and Class Members sustained damages as alleged herein.

202.    Plaintiffs and Class Members would not have used Defendant's services or would have paid substantially less for those services, had they known their Sensitive Information would be disclosed.

203.    Plaintiffs and Class Members are entitled to compensatory, consequential, and/or nominal damages as a result of Defendant's breaches of implied contract.

**COUNT VII**
**VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**("ECPA"), 18 U.S.C. § 2511(1),** *et seq.*
**Unauthorized Interception, Use, and Disclosure**
***(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the Illinois and/or New***
***Jersey Subclass(es))***

204. Plaintiffs repeat and reallege the allegations contained in paragraphs 196 through 203 as if fully set forth herein.

205. The ECPA protects both sending and receipt of communications.

206. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

207. The transmissions of Plaintiffs' Genetic Testing Information to Defendant's Website qualify as "communications" under the ECPA's definition of 18 U.S.C. § 2510(12).

208. <u>Electronic Communications</u>. The transmission of Genetic Testing Information between Plaintiffs and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

209. <u>Content</u>. The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

210. <u>Interception</u>. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or

other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

211.    <u>Electronical, Mechanical or Other Device</u>. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a.    Plaintiffs' and Class Members' browsers;

b.    Plaintiffs' and Class Members' computing devices;

c.    Defendant's web-servers; and

d.    The Pixel code deployed by Defendant to effectuate the sending and acquisition of patient communications.

212.    By utilizing and embedding the Pixels on its Website, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

213.    Specifically, Defendant intercepted Plaintiffs' and Class Members' electronic communications via the Pixels, which tracked, stored, and unlawfully disclosed Plaintiffs' and Class Members' Genetic Testing Information to third parties such as Google.

214.    Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiffs and Class Members regarding their Genetic Testing Information, including their applications for a debt consolidation loan, and the determination of whether or not to grant those loans.

215.    By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiffs and Class Members to third parties, while knowing or having reason

to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

216. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

217. <u>Unauthorized Purpose</u>. Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, invasion of privacy, among others.

218. The ECPA provides that a "party to the communication" may liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

219. Defendant is not a party for purposes to the communication based on its unauthorized duplication and transmission of communications with Plaintiffs and the Class. However, even assuming Defendant is a party, Defendant's simultaneous, unknown duplication, forwarding, and interception of Plaintiffs' and Class Members' Genetic Testing Information does not qualify for the party exemption.

220. Defendant's acquisition of sensitive communications that were used and disclosed to Google and Facebook was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and individual States nationwide as set forth herein, including:

a. The Illinois Genetic Information Privacy Act, 410 ILCS 513/1, *et seq.*;

    b.      The Illinois Eavesdropping Statute, 720 ILCS 5/14-1, *et seq.*;

    c.      The New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq.*;

    d.      Invasion of privacy; and

    e.      Breach of confidence.

221. Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it used and caused to be used cookie identifiers associated with specific users, including Plaintiffs and Class Members, without user authorization; and disclosed Genetic Testing Information to Google without user authorization.

222. Defendant is not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiffs' and Class Members' communications about their Genetic Testing Information on its Website, because it used its participation in these communications to improperly share Plaintiffs' and Class Members' Genetic Testing Information with Google and third-parties that did not participate in these communications, that Plaintiffs and Class Members did not know were receiving their Genetic Testing Information, and that Plaintiffs and Class Members did not consent to receive their Genetic Testing Information.

223. As such, Defendant cannot viably claim any exception to ECPA liability.

224. Plaintiffs and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

    a.      Learning that Defendant has intruded upon, intercepted, transmitted, shared, and used their Genetic Testing Information for commercial purposes has caused Plaintiffs and Class Members to suffer emotional distress;

    b.      Defendant received substantial financial benefits from its use of Plaintiffs' and Class Members' Genetic Testing Information without providing any value or benefit to Plaintiffs or Class Members;

    c.      Defendant received substantial, quantifiable value from its use of Plaintiffs' and Class Members' Genetic Testing Information, such as understanding

how people use its Website and determining what ads people see on its Website, without providing any value or benefit to Plaintiffs or Class Members;

d.   The diminution in value of Plaintiffs' and Class Members' Genetic Testing Information and/or the loss of privacy due to Defendant making such Genetic Testing Information, which Plaintiffs and Class Members intended to remain private, no longer private.

225.   Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Pixels to track and utilize Plaintiffs' and Class Members' Genetic Testing Information for financial gain.

226.   Defendant was not acting under color of law to intercept Plaintiffs' and the Class Members' wire or electronic communication.

227.   Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading their privacy via the Pixels.

228.   Any purported consent that Defendant may claim it received from Plaintiffs and Class Members was not valid.

229.   In sending and acquiring the content of Plaintiffs' and Class Members' communications relating to the browsing of Defendant's Website, Defendant's purpose was tortious, criminal, and designed to violate federal and state legal provisions including a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person.

230.   As a result of Defendant's violation of the ECPA, Plaintiffs and the Class are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

**COUNT VIII**

## VIOLATIONS OF ILLINOIS EAVESDROPPING STATUTE
### 720 ILCS 5/14-1, *et seq.*
### (*On Behalf of Plaintiff Carter and the Illinois Subclass*)

231.   Plaintiffs repeat and reallege the allegations contained in paragraphs 204 through 230 as if fully set forth herein.

232.   720 ILCS 5/14-2 prohibits any person from (1) using an eavesdropping device, in a surreptitious manner, to "record[] all or any part of any private conversation to which he or she is a party unless he or she does so with the consent of all other parties to the private conversation"; (2) "[i]ntercept[ing], record[ing], or transcrib[ing] in a surreptitious manner, any private electronic communication to which he or she is not a party unless he or she does so with the consent of all parties"; and (3) "us[ing] or disclos[ing] any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of this Article, unless he or she does so with the consent of all of the parties."

233.   The Tracking Technologies constitute "eavesdropping devices" under 720 ILCS 5/14-1(a).

234.   Defendant violated the Illinois Eavesdropping Statute by:

a.   Using the Tracking Technologies to record the sensitive communications made by and to Plaintiffs and Class Members through its Website with third parties, including Google, without their knowledge of consent;

b.   Transmitting the sensitive communications made by and to Plaintiffs and Class Members through its Website with third parties, including Google, without their knowledge of consent; and,

c.   Disclosing the sensitive communications made by and to Plaintiffs and Class

Members through its Website to third parties, including Google, in exchange for marketing and advertising services.

235.    Plaintiff Carter and Illinois Subclass Members seek all monetary and non-monetary relief allowed by law, including injunctive relief, other equitable relief, actual damages, treble damages, restitution, and attorneys' fees, filing fees, and costs

<u>**COUNT IX**</u>
**VIOLATIONS OF NEW JERSEY CONSUMER FRAUD ACT**
**N.J. Stat. Ann. 56:8-1,** *et seq.*
<u>(***On Behalf of Plaintiff Hawks and the New Jersey Subclass***</u>)

236.    Plaintiffs repeat and reallege the allegations contained in paragraphs 231 through 235 as if fully set forth herein.

237.    Defendant is a "person," as defined by N.J. Stat. Ann. § 56:8-1(d).

238.    Defendant sells "merchandise," as defined by N.J. Stat. Ann. § 56:8-1(c) & (e).

239.    N.J. Stat. Ann. 56:8-2 prohibits:

The act, use or employment by any person of any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby[.]

240.    Defendant violated the New Jersey Consumer Fraud Act by falsely promising to maintain the confidentiality of Plaintiff Hawks' and New Jersey Subclass Members' Genetic Testing Information, and failing to inform Plaintiff Hawks and New Jersey Subclass Members that it would provide their Genetic Testing Information to third parties, as detailed above.

241.    Defendant intended to mislead Plaintiff Hawks and New Jersey Subclass Members and intended to induce Plaintiff Hawks and New Jersey Subclass Members to rely on its misrepresentations and omissions.

242.    Plaintiff Hawks and New Jersey Subclass Members seek all monetary and non-monetary relief allowed by law, including injunctive relief, other equitable relief, actual damages, treble damages, restitution, and attorneys' fees, filing fees, and costs

## COUNT X
## UNJUST ENRICHMENT
### *(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the Illinois and/or New Jersey Subclass(es))*

243.    Plaintiffs repeat and reallege the allegations contained in paragraphs 236 through 242 as if fully set forth herein.

244.    Plaintiffs plead this claim in the alternative to their breach of implied contract claim.

245.    Plaintiffs and Class Members conferred a monetary benefit on Defendant. Specifically, they provided their Sensitive Information to Defendant, which it exchanged for marketing and advertising services, as described, *supra*.

246.    Defendant knew that Plaintiffs and Class Members conferred a benefit which Defendant accepted. Defendant profited from the Sensitive Information of Plaintiffs and Class Members by exchanging it for marketing and advertising services.

247.    In particular, Defendant enriched itself by obtaining the inherent value of Plaintiffs' and Class Members' Sensitive Information, and by saving the costs it reasonably should have expended on marketing and/or data security measures to secure Plaintiffs' and Class Members' Sensitive Information.

248.    Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the privacy of their Sensitive Information.

249.    Under the principles of equity and good conscience, Defendant should not be

permitted to retain the money belonging to Plaintiffs and Class Members, obtained by its surreptitious collection and transmission of their Sensitive Information.

250.    If Plaintiffs and Class Members knew that Defendant had not reasonably secured their Sensitive Information, they would not have agreed to provide their Sensitive Information to Defendant.

251.    Plaintiffs and Class Members have no adequate remedy at law for this count. An unjust enrichment theory provides the equitable disgorgement of profits even where an individual has not suffered a corresponding loss in the form of money damages.

252.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will continue to suffer injury.

253.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them, or to refund the amounts that Plaintiffs and Class Members overpaid for Defendant's services.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and other Class and Subclass Members, pray for judgment against Defendant as follows:

A.    an Order certifying the Nationwide Class, and Illinois and New Jersey Subclasses, and appointing the Plaintiffs and their Counsel to represent the Classes;

B.    equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Genetic Testing Information of Plaintiffs and Class Members;

C.    injunctive relief requested by Plaintiffs, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members;

D.    an award of all damages available at equity or law, including, but not limited to, actual, consequential, punitive, statutory and nominal damages,

as allowed by law in an amount to be determined;

E.     an award of attorney fees, costs, and litigation expenses, as allowed by law;

F.     prejudgment interest on all amounts awarded and

G.     all such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and other members of the proposed Classes, hereby demand a jury trial on all issues so triable.

Dated: January 8, 2025     Respectfully submitted,

*/s/ Kyle McLean*
Kyle D. McLean (ARDC 6344126)
**SIRI & GLIMSTAD LLP**
700 S. Flower Street, Suite 1000
Los Angeles, CA 90017
Tel: (213) 297-5195
E: kmclean@sirillp.com

Tyler J. Bean*
Sonjay C. Singh*
David DiSabato*
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: tbean@sirillp.com
E: ssingh@sirillp.com
E: ddisabato@sirillp.com

*pro hac vice admission anticipated*

*Attorneys for Plaintiffs and the Class*