**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **KAREN CARTER** and **ARTHUR PODROYKIN** on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**MYHERITAGE (USA), INC. and MYHERITAGE LTD CORPORATION**,<br><br>Defendant. | Case No. 1:25-cv-00224<br>Hon. Joan H. Lefkow.<br><br>**JURY TRIAL DEMANDED** |

**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

Plaintiffs Karen Carter and Arthur Podroykin (collectively, "Plaintiffs"), individually and on behalf of all similarly situated persons, allege the following against MyHeritage (USA), Inc. and MyHeritage Ltd Corporation (together, "MyHeritage" or "Defendants") based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation by Plaintiffs' counsel and review of public documents as to all other matters:

**INTRODUCTION**

1. A person's genetic code is the single most sensitive piece of information about them. It can reveal a number of private facets of their life, including their health conditions, ethnic background, predisposition to cognitive and physical disorders, their parentage, and the parentage of their children.

2. Consequently, when individuals undergo genetic testing, they are subject to an inherent risk: if their genetic information is misused or improperly disclosed by a testing company,

it can never be fully remedied. Unlike a credit card number, telephone number, or even a social security number, genetic information is immutable. It cannot be altered to preclude an individual with access from using it or sharing it with an unauthorized third party in the future.

3. Unfortunately, unbeknownst to Plaintiffs and other visitors to Defendants' website, MyHeritage does not keep sensitive information about their visitors private. Instead, Defendants collect and transmit personally identifiable information regarding both the fact that their customers have been subject to genetic testing, and the results of that genetic testing (collectively, "Genetic Testing Information"), to third parties, including Alphabet, Inc. ("Google"), through their use of surreptitious online tracking tools.

4. Online advertising giants, like Google, compile as much information as possible about American consumers, including information relating to the most private aspects of their lives, as fuel for their massive, targeted advertising enterprise. Thus, any information about a person captured by those online advertisers can be used to stream ads to that person. If Google receives information that a person is using genetic testing to research their ancestry or health conditions, they will use that information, and allow their clients to use that information, to stream ads to that person's computers and smartphones related to other genetic testing products, as well as products and services related to the person's genetic results or health conditions.

5. Google offers website operators access to its proprietary suites of marketing, advertising, and customer analytics software, including Google Analytics, Google AdSense, and Google Tag Manager (collectively, the "Business Tools"). Armed with these Business Tools, website operators can leverage Google's enormous database of consumer information for the purposes of deploying targeted advertisements, performing minute analyses of their customer bases, and identifying new market segments that may be exploited.

6. But, in exchange for access to these Business Tools, website operators install Google's surveillance software on their website (the "Tracking Tools"), including 'tracking pixels' ("Pixels") and third-party 'cookies' that capture sensitive, personally identifiable information provided to the website operator by its website users and disclose this information to Google without the customers' knowledge or consent. This sensitive information can include a unique identifier that Google uses to identify that customer, regardless of what computer or phone is used to access the website. The Tracking Tools can also capture and share other information like the specific webpages visited by a website user, items added to an online shopping cart by a website user, information entered into an online form by a website user, and the device characteristics of a website user's phone or computer.

7. In essence, when website operators use Google's Business Tools, they choose to participate in Google's mass surveillance network and, in turn, benefit from Google's collection of user data at the expense of their customers' privacy.

8. MyHeritage is one of the companies that has chosen to prioritize their marketing efforts over their customers' privacy, by installing Google's Tracking Tools on their Website.

9. MyHeritage is a direct-to-consumer ("DTC") genetic testing kit provider that uses DNA testing to identify its customers' "unique ethnic background."[1] According to the Website, "[m]illions of families around the world use MyHeritage to explore their history.[2]

10. To use Defendants' genetic testing service, consumers purchase one of Defendants' test kits through their website, www.myheritage.com (the "Website"), or from a third-party retailer, and provide a saliva sample to the Defendants for analysis.

---

[1] *Home Page*, MYHERITAGE, https://www.myheritage.com/ (last visited Jan. 5, 2025).

[2] *Id*.

11. To receive their genetic testing results, Defendants' customers, like Plaintiffs and Class Members, are required to register on Defendants' Website. When Defendants complete their genetic analysis, Defendants' customers must log into the Website portal to view their genetic testing results.

12. In their Privacy Policy, Defendants explicitly promise their customers, like Plaintiffs and Class Members, in all caps, that "MYHERITAGE HAS NEVER SOLD OR LICENSED GENETIC DATA OR HEALTH DATA, AND WILL NEVER DO SO IN THE FUTURE."[3]

13. Each of the Plaintiffs and Class Members visited the Website and had their personal Genetic Testing Information tracked by Defendants using the Tracking Tools. However, Defendants ***never*** obtained authorization from Plaintiffs or Class Members to share their Genetic Testing Information with third parties. At all times relevant to this action, Plaintiffs and Class Members gave no informed consent for Defendants to transmit to the third parties, including the largest advertiser and compiler of consumer data in the world, information about their Genetic Testing Information.

14. Defendants' transmission of Plaintiffs' and Class Members' Genetic Testing Information was not just contrary to their customers' reasonable expectation of privacy and their own Privacy Statement – it was also a violation of Illinois law.

15. In recognition of the highly sensitive nature of genetic testing information, Illinois has enacted legislation decreeing that genetic testing and information derived therefrom is

[3] *Privacy Policy*, MYHERITAGE, https://www.myheritage.com/privacy-policy (last visited Jan. 5, 2025).

protected. The Illinois Genetic Information Privacy Act, 410 ILCS 513/1, *et. seq* ("GIPA") acknowledges that maintaining the confidentiality of genetic information is in the public interest.[4]

16. Consistent with this goal, GIPA provides strong legal protections to ensure that Illinois residents can take advantage of the knowledge that can be gained from obtaining personal Genetic Testing Information, without fear that this same information could be disclosed to third parties without their consent.

17. GIPA prohibits DTC test kit companies like Defendants from sharing information derived from genetic tests, including the fact that an individual was the subject of a genetic test. Such information may be released only to the individual tested and to persons specifically authorized by the test subject.

18. Defendants chose to repeatedly disregard Illinois' genetic privacy laws by sharing consumers' confidential genetic information.

19. Accordingly, Plaintiffs seek on behalf of themselves, and all of Defendants' other similarly situated customers in the state, an order: (i) requiring Defendants to cease the unlawful activities discussed herein; and (ii) awarding actual and/or statutory damages to Plaintiffs and the members of the proposed Class.

[4] *See* 410 ILCS 513/5(2)-(3): "[M]any members of the public are deterred from seeking genetic testing because of fear that test results will be disclosed without consent in a manner not permitted by law[.]"; "The public health will be served by facilitating voluntary and confidential nondiscriminatory use of genetic testing information."

## PARTIES

***Plaintiff Karen Carter***

20. Plaintiff Carter is a citizen of the state of Illinois, residing in LaSalle County and brings this action in an individual capacity, and on behalf of all others similarly situated.

21. In or around November of 2023, Plaintiff Carter purchased a genetic test kit from Defendants. When the results of her genetic testing were made available by Defendants, Plaintiff was required to use Defendants' Website on her personal electronic devices to review the findings of Defendants' genetic analysis.

22. Plaintiff Carter reviewed the results of her genetic testing in the same manner as depicted in Section V(A)(d), *infra*.

23. Plaintiff Carter never authorized Defendants to disclose any aspect of her communications with Defendants through the Website to third parties, including the Genetic Testing Information that she provided to Defendants.

24. On every occasion that she visited Defendants' Website, Plaintiff Carter possessed accounts with Google, and she accessed Defendants' Website while logged into her Google account on the same device.

25. Plaintiff Carter has not used or visited the Website since November of 2023.

26. After providing her Genetic Testing Information to Defendants through the Website, Plaintiff Carter immediately began seeing targeted online advertisements for genetic testing products.

***Plaintiff Arthur Podroykin***

27. Plaintiff Podroykin is a citizen of the state of Illinois, residing in Champaign County and brings this action in an individual capacity, and on behalf of all others similarly situated.

28. In or around May 2021, Plaintiff Podroykin purchased a genetic test kit from Defendants' website. Defendants required Plaintiff to make an account on their website in order to access the test results. When the results of his genetic testing were made available by Defendants, Plaintiff was required to use Defendants' Website on his personal electronic devices to review the findings of Defendants' genetic analysis.

29. Plaintiff Podroykin reviewed the results of his genetic testing in the same manner as depicted in Section V(A)(d), infra.

30. Unbeknownst to Plaintiff Podroykin, when he reviewed the results of his genetic test Defendants transmitted his Genetic Testing Information to unauthorized third parties, including Google.

31. The information transmitted to Google and other third parties by the Pixels installed on Defendants' website included the fact that he was the subject of genetic testing, the results of that genetic testing, and that he was viewing his "DNA Results," as well as his last name.

32. Further, the information transmitted to Google was accompanied by specific lines of code linking the information transmitted to Google to Plaintiffs' identity. Defendants' website transmitted the identifier number attached to Google's '_cid' and '_gid' cookies, which identify the Plaintiffs' Google account. Defendants' website also transmitted information that is commonly used to create a browser fingerprint, such as Plaintiffs' language selection, screen resolution, location, and IP address information.

33. Plaintiff Podroykin never authorized Defendants to disclose any aspect of his communications with Defendants through their Website to third parties, including the Genetic Testing Information that he provided to Defendants.

34. On every occasion that he visited Defendants' Website, Plaintiff Podroykin possessed accounts with Google, and he accessed Defendants' Website while logged into his Google account on the same device.

35. After providing his Genetic Testing Information to Defendants through the Website, Plaintiff Podroykin began seeing targeted online advertisements for genetic testing products.

***Defendant MyHeritage (USA), Inc.***

36. MyHeritage (USA), Inc. is a limited company incorporated in the State of Delaware, with its principal place of business at 3098 Executive Parkway, Suite 275, Lehi, UT 84043, in Utah County.

***Defendant MyHeritage LTD Corporation***

37. MyHeritage LTD Corporation is a foreign business corporation, registered in the state of Utah and with a physical address listed as 3 Ariel Sharon Street, OR Yehuda Israel, 60250. MyHeritage LTD Corporation's registered agent is MyHeritage (USA), Inc.

## JURISDICTION AND VENUE

38. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members and minimal diversity exists because Plaintiffs and some putative class members are citizens of a different state than Defendants. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

39. This Court has personal jurisdiction over Defendants because Defendants regularly conduct business in the State of Illinois, and because Defendants have advertised and sold their DTC genetic testing products to consumers in the State of Illinois and in this judicial district.

40. Personal jurisdiction is also proper because Defendants committed tortious acts in the State of Illinois and this judicial district and Plaintiffs' claims arise out of such acts, and/or because Defendants have otherwise made or established contacts in the State of Illinois and in this judicial district sufficient to permit the exercise of personal jurisdiction.

41. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims in this action occurred in this judicial district.

**THE ILLINOIS GENETIC INFORMATION PRIVACY ACT ("GIPA")**

42. During the 1990s, the U.S. government poured billions of dollars into the Human Genome Project in an attempt to map the entire human genetic code. When President Clinton announced the first successful "rough draft" of the Project in 2000, he hailed it as one of the great achievements of human history, and said: "Today we are learning the language with which God created life[.]"[5]

43. However, like any great leap in human understanding, learning the meaning of people's genetics came with many concerns. One movie released around this time, the dystopian science fiction movie *Gattaca*, attempted to show how this new technology could be abused. The movie conjured a not-too-distant future where genetic discrimination was rampant. In the movie, companies segregated people based on their genetic profiles, those with better genetic profiles (i.e., genetically engineered humans) were eligible for professional employment, while others

[5] Nicholas Wade, *Scientists Complete Rough Draft of Human Genome*, NEW YORK TIMES (June 26, 2000), *available online at*: https://archive.nytimes.com/www.nytimes.com/library/national/science/062600sci-human-genome.html?amp;sq=francis%252520collins&st=cse&scp=23.

with less desirable genetics (e.g., susceptibility to heart disease or cancer) were unemployable or relegated to menial jobs. Since its release, the film has been regularly used in schools to show the possible misuses of genetic information.[6]

44. Illinois stood at the forefront of protecting its citizens from the abuse of this technology when it first passed GIPA in 1998. According to the Illinois Legislature, the intent of GIPA is to encourage the public to embrace genetic testing by eliminating any perception that genetic information gleaned from those tests (such as family medical history) could later be demanded from and/or used against them. Limiting "requests for [] protected health information to the minimum necessary to accomplish an intended purpose … is a key component of health information privacy." 410 ILCS 513/5(5).

45. The Illinois Legislature amended GIPA in 2008 to increase its protections and harmonize Illinois state law with the then-recently passed Federal Genetic Information Nondiscrimination Act of 2008 ("**GINA**"), 110 P.L. 233; *see also* 42 U.S.C. § 2000ff. The 2008 amendments to GIPA sought to further bar the practices of employers relating to the use of genetic information of employees, including such employees' family medical history.

46. During discussions of the 2008 GIPA amendments, the Illinois Legislature recognized the importance of safeguarding family medical history due to the fact that it is akin to knowledge of genetic predispositions:

> I hope the [legislature] understands the importance of [family medical history]; it's becoming more and more important. Back in '96 or '97, I had a third generation ovarian cancer survivor that came to me with this issue. … If a woman has … the gene that causes breast cancer, she can have up to an 84 percent probability that she will develop breast cancer sometime in her life … it's important that

[6] Hannah Docter-Loeb, *What Do People Who Work in Genetics Think About Gattaca 25 Years After Its Release*, SLATE (Aug. 15, 2022), https://slate.com/technology/2022/08/gattaca-25th-anniversary-genetics-crispr.html (last accessed Jan. 5, 2025).

> we help people be able to know that information and know they won't be discriminated against in their employment …. Quite honestly, with genetic information we have today, we could identify a pool of people that … no one would want to employ. [GIPA] helps guarantee that we don't have that kind of discrimination occur.

Illinois House Transcript, 2008 Reg. Sess. No. 276, pp. 33-34.

47. GIPA bars companies such as Defendants from sharing genetic information with unauthorized third parties. Specifically, GIPA states: "Except as otherwise provided in this Act, genetic testing and information derived from genetic testing is confidential and privileged and may be released only to the individual tested and to persons specifically authorized, in writing in accordance with Section 30, by that individual to receive the information." 410 ILCS 513/15(a).

48. GIPA further provides: "No person may disclose or be compelled to disclose the identity of any person upon whom a genetic test is performed or the results of a genetic test in a manner that permits identification of the subject of the test[.]" 410 ILCS 513/30(a).

49. A company providing direct-to-consumer commercial genetic testing is prohibited from sharing any genetic test information or other personally identifiable information about a consumer with any health or life insurance company without written consent from the consumer. 410 ILCS 513/20(e).

50. In order to enforce these and other requirements, GIPA provides individuals with a broad private right of action, stating: "Any person aggrieved by a violation of this Act shall have a right of action … against an offending party." 410 ILCS 513/40(a). Under this private right of action, a party may recover, for each violation: (a) $2,500 or actual damages, whichever is greater, for a negligent violation, or $15,000 or actual damages, whichever is greater, for a willful violation; (b) reasonable attorneys' fees; and (c) "[s]uch other relief, including an injunction, as the … court may deem appropriate." *Id.*

51. Plaintiffs are not required to allege or prove actual damages in order to state a claim under GIPA, and they can seek statutory damages under GIPA as compensation for the injuries caused by Defendants. *See Rosenbach v. Six Flags Ent. Corp.*, 2019 IL 123186, at ¶ 40, 432 Ill. Dec. 654, 129 N.E.3d 1197 (holding by the Illinois Supreme Court that "an individual need not allege some actual injury or adverse effect, beyond violation of his or her rights under [the Illinois Biometric Privacy Act ("**BIPA**")] in order to qualify as an 'aggrieved person' under BIPA); *see also Bridges v. Blackstone Grp., Inc.*, 2022 U.S. Dist. LEXIS 121205, at *8 (S. D. Ill. July 8, 2022) (holding that it is appropriate to apply BIPA's definition of "aggrieved person" used by the *Rosenbach* court to alleged violations of GIPA).

52. Thus, GIPA provides valuable privacy rights, protections, and benefits to the citizens of Illinois and provides those citizens with the means to aggressively enforce those rights.

## FACTUAL ALLEGATIONS

### A. DEFENDANTS' USE OF THIRD-PARTY TRACKING TECHNOLOGIES

#### a. Google's Mass Advertising Surveillance Operation

53. Google is the largest digital advertiser in the country, accounting for 26.8-percent of the total digital advertising revenue generated in the United States.[7] In 2023, Google's advertising revenue of $238 billion accounted for 77-percent of its total revenue for the year.[8]

54. Google advertises Google Analytics and other Business Tools to website operators, like Defendants, claiming they will allow the operator to "[u]nderstand [their] site and app users," "check the performance of [their] marketing," and "[g]et insights only Google can give."[9] But, in order for website operators to get information from Google Analytics about their website's visitors, they must allow data collection through installation of Google's Tracking Tools on their website.[10]

55. Indeed, on its *Privacy & Terms* page, Google admits that it collects information from third party websites, stating that: "[m]any websites and apps use Google services to improve

---

[7] *Share of major ad-selling companies in digital advertising revenue in the United States*, STATISTA (May 2024), https://www.statista.com/statistics/242549/digital-ad-market-share-of-major-ad-selling-companies-in-the-us-by-revenue/#:~:text=In%202023%2C%20Google%20accounted%20for,21.1%20and%2012.5%20percent%2C%20respectively https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last accessed Jan. 5, 2025).

[8] Florian Zandt, *Google's Ad Revenue Dwarfs Competitors*, STATISTA (Sep. 10, 2024), https://www.statista.com/chart/33017/annual-advertising-revenue-of-selected-tech-companies-offering-search-solutions/#:~:text=Online%20advertising&text=Alphabet%2C%20the%20company%20behind%20the,overall%20revenue%20this%20past%20year (last accessed Jan. 5, 2025).

[9] *Welcome to Google Analytics*, GOOGLE, https://analytics.google.com/analytics/web/provision/?authuser=0#/provision (last accessed Jan. 5, 2025).

[10] *See* Aaron Ankin & Surya Matta, *The High Privacy Cost of a "Free" Website*, THE MARKUP, https://themarkup.org/blacklight/2020/09/22/blacklight-tracking-advertisers-digital-privacy-sensitive-websites (last accessed Jan. 5, 2025).

their content and keep it free. When they integrate our services, these sites and apps share information with Google."[11]

56. Google also admits that it uses the information collected from third party websites, such as Defendants', to sell targeted advertising, explaining to users that: "[f]or example, a website that sells mountain bikes might use Google's ad services. After you visit that site, you could see an ad for mountain bikes on a different site that shows ads served by Google."[12]

57. While Google admits that it collects information from third-party websites through the Tracking Tools, it does not provide, nor could it provide, a publicly available list of every webpage on which its Tracking Tools are installed. As such, the vague descriptions of Google's data collection practices referenced above could not give Plaintiffs and Class Members any reason to think that Defendants were part of Google's surveillance network. Moreover, as Defendants do not disclose their use of Google's Tracking Tools, Plaintiffs and Class Members could not have been reasonably expected to review any of Google's privacy statements in connection with their use of the Website.

58. Google aggregates the user information that it collects from third-party websites into 'advertising profiles' consisting of all of the data that it has collected about a given user.[13] With these advertising profiles, Google can sell hyper-precise advertising services, allowing its clients to target internet users based on combinations of their location, age, race, interests, hobbies, life events (e.g., recent marriages, graduation, or relocation), political affiliation, education level,

---

[11] *Privacy & Terms – How Google uses information from sites or apps that use our services*, GOOGLE, https://policies.google.com/technologies/partner-sites (last accessed Jan. 5, 2025).

[12] *Id*.

[13] Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive Into the Technology of Corporate Surveillance*, ELECTRONIC FRONTIER FOUNDATION (2019), *available online at*: https://www.eff.org/files/2019/12/11/behind_the_one-way_mirror-a_deep_dive_into_the_technology_of_corporate_surveillance_0.pdf.

home ownership status, marital status, household income, type of employment, use of specific apps or websites, and more.[14]

59. Google's surveillance of individual's internet usage is ubiquitous. In 2017, Scientific American reported that over 70-percent of smartphone apps report "personal data to third-party tracking companies like Google,"[15] and Google trackers are present on 74-percent of all web traffic.

60. Moreover, as in this case, the data collected by Google often pertains to the most personal and sensitive aspects of an individual's life. For example:

i. 93-percent of pornography websites allow third parties, including Google, to collect their user's browsing habits.[16] In fact, Google advertising trackers were found on 73-percent of pornography websites.[17]

ii. 81-percent of the most popular mobile apps for managing depression and quitting smoking allowed Facebook and/or Google to access subscriber information, including health diary entries and self-reports about substance abuse.[18]

iii. Twelve of the largest pharmacy providers in the United States send information regarding user's purchases of products such as pregnancy tests, HIV tests, prenatal vitamins, and Plan B to online advertisers.[19] For example, when an online shopper searches for a pregnancy test, views the product page for a pregnancy test, or adds

---

[14] *About audience segments*, GOOGLE ADS, https://support.google.com/google-ads/answer/2497941?hl=en#zippy=%2Cin-market-segments%2Caffinity-segments%2Clife-events%2Cdetailed-demographics (last accessed Jan. 5, 2025).

[15] Narseo Vallina-Rodriguez & Srikanth Sundaresan, *7 in 10 Smartphone Apps Share Your Data with Third-Party Services*, SCIENTIFIC AMERICAN (May 30, 2017), https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last accessed Jan. 5, 2025).

[16] Elena Maris, Timothy Libert & Jennifer R. Henrichsen, *Tracking sex: The implications of widespread sexual data leakage and tracking on porn websites*, NEW MEDIA & SOCIETY (2020), *available online at*: https://journals.sagepub.com/doi/10.1177/1461444820924632.

[17] *Id*.

[18] Kit Huckvale, John Torous & Mark E. Larsen, *Assessment of the Data Sharing and Privacy Practices of Smartphone Apps for Depression and Smoking Cessation*, JAMA NETWORK OPEN (2019), *available online at*: https://pubmed.ncbi.nlm.nih.gov/31002321/.

[19] Darius Tahir & Simon Fondrie-Teitler, *Need to Get Plan B or an HIV Test Online? Facebook May Know About It*, THE MARKUP (June 30, 2023), https://themarkup.org/pixel-hunt/2023/06/30/need-to-get-plan-b-or-an-hiv-test-online-facebook-may-know-about-it (last accessed Jan. 5, 2025).

a pregnancy test to their online shopping cart on Kroger's website, that information is transmitted to Google.[20]

61. This monumental, invasive surveillance of Americans' internet usage is not accidental. As Google's then-CEO Eric Schmit admitted in 2010: "We know where you are. We know where you've been. We can more or less know what you're thinking about."[21]

62. In fact, Google values user information so highly that it provides its Business Tools to many website operators for free, all to expand its surveillance apparatus.[22]

63. When website operators, like Defendants, make use of Google's Business Tools, they are essentially choosing to participate in Google's mass surveillance network, and in return they benefit from Google's collection of user data, at the expense of their website users' privacy. For example, Google rewards website operators for providing it with their user's information by granting access to its Analytics platform, which leverages demographic data collected by Google to provide detailed analyses of the website's user base.[23]

64. In many cases, a website operator's use of third-party tracking software is not disclosed whatsoever in its privacy policy.[24] Even where the use of such third-party software is disclosed, such disclosures are often hidden and cloaked in such confusing, technical and overly legal language as to be indecipherable to the typical internet user.[25]

---

[20] Jon Keegan, *Forget Milk and Eggs: Supermarkets Are Having a Fire Sale on Data About You*, THE MARKUP (Feb. 16, 2023), https://themarkup.org/privacy/2023/02/16/forget-milk-and-eggs-supermarkets-are-having-a-fire-sale-on-data-about-you (last accessed Jan. 5, 2025).

[21] Andrew Orlowski, *Google's Schmidt: We know what you're thinking*, THE REGISTER (Oct. 4, 2020), https://www.theregister.com/2010/10/04/google_ericisms/ (last accessed Jan. 5, 2025).

[22] *Analytics Overview*, GOOGLE, https://marketingplatform.google.com/about/analytics/ (last accessed Jan. 5, 2025) ("Google Analytics gives you the tools, free of charge"),

[23] *Google Marketing Platform – Features*, GOOGLE, https://marketingplatform.google.com/about/analytics/features/ (last accessed Jan. 5, 2025).

[24] *See* Woodrow Hartzog, *Privacy's Blueprint*, 60-67 (Harvard University Press 2018) (detailing deficiencies with online privacy policies).

[25] *Id*.

65. Moreover, for even a conscientious internet user, the massive volume of privacy policies encountered through routine internet use makes reviewing each and every one practically impossible. According to one study, it would take the average internet user 244 hours – or 30.5 working days – to read the privacy policy of every new website that they visited in a single year.[26]

**b. Pixels Can Record Almost Every Interaction Between a User and a Website**

66. In order to use Google's Business Tools, Defendants installed Google's Tracking Tools, including tracking Pixels, onto its website.

67. Pixels are one of the tools used by website operators to track user behavior. As the Federal Trade Commission ("FTC") explains, a Pixel is:

> [A] small piece of code that will be placed into the website or ad and define [the Pixel operator's] tracking goals such as purchases, clicks, or pageviews…
>
> Pixel tracking can be monetized several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns…Another is that companies can monetize the data collected by further optimizing their own ad targeting systems and charging other companies to use its advertising offerings.[27]

68. Pixels can collect a shocking amount of information regarding an individual's online behavior, including the webpages viewed by the user, the amount of time spent by the user on specific webpages, the buttons and hyperlinks that the user clicks while using a website, the items that the user adds to an online shopping cart, the purchases that a user makes through an

[26] Aleecia M. McDonald & Lorrie Faith Cantor, *The Cost of Reading Privacy Policies*, I/S: A JOURNAL OF LAW AND POLICY FOR THE INFORMATION SOCIETY (2008), *available online at*: https://lorrie.cranor.org/pubs/readingPolicyCost-authorDraft.pdf.

[27] *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FEDERAL TRADE COMMISSION – OFFICE OF TECHNOLOGY (Mar. 6, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking (last accessed Jan. 5, 2025).

online retailer, the text entered by the user into a website search bar, and even the information provided by the user on an online form.[28]

69. But most internet users are completely unaware that substantial information about their internet usage is being collected through tracking Pixels. The FTC warns that:

> Traditional controls such as blocking third party cookies may not entirely prevent pixels from collecting and sharing information. Additionally, many consumers may not realize that tracking pixels exist because they're invisibly embedded within web pages that users might interact with…Academic and public reporting teams have found that thousands of the most visited webpages have pixels and other methods that leak personal information to third parties.[29]

**c. The Pixels Installed on Defendants' Website Transmit Personally Identifiable Information to Google**

70. Every website is hosted by a computer "server" that holds the website's contents.

71. To access a website, individuals use "web browsers." Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the Internet. Each "client device" (such as computer, tablet, or smartphone) accesses web content through a web browser (such as Google's Chrome, Mozilla's Firefox, Apple's Safari, or Microsoft's Edge).

72. Communications between a website server and web browser consist of Requests and Responses. Any given browsing session may consist of hundreds or even thousands of individual Requests and Responses. A web browser's Request essentially asks the website to provide certain information, such as the contents of a given webpage when the user clicks a link,

---

[28] *See id.*; *How does retargeting on Facebook help your business?*, META, https://www.facebook.com/business/goals/retargeting (last accessed Jan. 5, 2025); Tom Kemp, *"Oops! I Did It Again" … Meta Pixel Still Hoovering Up Our Sensitive Data*, MEDIUM, https://tomkemp00.medium.com/oops-i-did-it-again-meta-pixel-still-hoovering-up-our-sensitive-data-f99c7b779d47#_ftn1 (last accessed Jan. 5, 2025).

[29] *Lurking Beneath the Surface, supra* note 27.

and the Response from the website sends back the requested information – the web pages' images, words, buttons, and other features that the browser shows on the user's screen as they navigate the website.

73. Additionally, on most websites, the Response sent back to the user's web browser directs the browser to create small files known as 'cookies' on the user's device.[30] These cookies are saved by the user's web browser, and are used to identify the website user as they browse the website or on subsequent visits to the site.[31] For example, in a more innocuous use case, a cookie may allow the website to remember a user's name and password, language settings, or shopping cart contents.[32]

74. When a Google user logs onto their account, their web browser records a Google tracking cookie.[33] This cookie include a specific line of code that links the web browser to the user's Google account.[34]

75. Google's Pixels use cookies, but operate differently than a cookie. Rather than directing the browser to save a file on the user's device, the Pixels acquires information from the browser, without notifying the user. The information can include details about the user, his or her interactions with the Website, and information about the user's environment (*e.g.,* type of device, type of browser, and sometimes even the physical location of the device), all relayed contemporaneously as the Website user navigates the Website.

---

[30] *What is a web browser?*, MOZILLA, https://www.mozilla.org/en-US/firefox/browsers/what-is-a-browser/ (last visited Nov. 25, 2024).

[31] *Id*.

[32] *Id*.

[33] Cyphers, *supra* note 13.

[34] *Id*.

76. Simultaneously, the Google Pixels, like those installed on Defendants' Website, request identifying information from any Google cookies previously installed on the user's web browser.

77. The Pixel then combines the data it received from the browser with the data it acquired from the cookie, and instructs the web browser to transmit the information back to Google. As a result, Google can link all of the user information collected by their Pixels on the Defendants' Website to the user's identity, via the user's Google profile. Thus, even if a user never actually logs into a website, or fills out a form, the website, along with Google, can know the user's identity.

78. A remarkable number of Americans possess a Google account. Just one of Google's many products, its Gmail e-mail client, is used by over one-third of Americans.[35] When these users visit a website, like Defendants', that utilizes a Google Pixel, any information collected by the Pixel can be linked to the user's identity through the Google cookies installed on the user's web browser.

79. However, it is not only Google account holders that are at risk of having Pixel-collected website data linked to their identities. Rather, Google utilizes sophisticated data tracking methods to identify even those few users who do not have a Google account.

80. Google's Pixels, like those on Defendants' website, can acquire information about the user's device and browser, such as their screen resolution, time zone setting, browser software type and version, operating system type and version, language setting, and IP address.

---

[35] *See* Harsha Kiran, *49 Gmail Statistics To Show How Big It Is In 2024*, TECHJURY (Jan. 3, 2024), https://techjury.net/blog/gmail-statistics/ (last accessed Jan. 5, 2025) ("Gmail accounts for 130.9 million of the total email users in the US"). The United States population is approximately 337.4 million. *See* UNITED STATES CENSUS BUREAU, https://www.census.gov/popclock/ (last accessed Jan. 5, 2025).

81. An internet user's combination of such device and browser characteristics, commonly referred to as their "browser fingerprint," is "often unique."[36] By tracking this browser fingerprint, Google is able to compile a user's activity across the internet.[37] And, as Google continuously compiles user data over time, its understanding of the user's browser fingerprint becomes more sophisticated such that it needs only to collect a single piece of identifying information to identify the user linked to a browser fingerprint.

**d. Defendants Disclosed Plaintiffs' and Class Members' Genetic Testing Information to Google**

82. Defendants' genetic testing service uses genomic testing to generate information on a customer's ancestry, ancestral origin, DNA relatives, and health traits and predispositions. To use Defendants' genetic testing service, consumers purchase one of Defendants' test kits through its Website or a third-party retailer, and provide a saliva sample to the Defendants for its analysis.

83. To receive their genetic testing results, Defendants' customers, like Plaintiffs and Class Members, are required to register on Defendants' Website. When Defendants complete their genetic analysis, Defendants' customers must log into the Website portal to view their genetic testing results.

84. Defendants' genetic test provides Defendants' customers with several different data points, including their ancestral ethnicity groups, and identification of potential relatives who have also taken a MyHeritage genetic test.

85. Unbeknownst to Plaintiffs and Class Members, Defendants intentionally configured the Tracking Tools, including the Pixels, installed on its Website to simultaneously and

[36] Cyphers, *supra* note 13.

[37] *Id*.

contemporaneously capture and transmit its customers' Genetic Testing Information to unauthorized third parties, including Google.

86. For example, the following screenshot ("Figure 1") depicts network transmission data captured from the Website, and shows that when Defendants' customers, including Plaintiffs and Class Members, view their DNA match analysis, the information requested and transmitted to Google by the Pixels installed on Defendants' website include the fact that the customer is viewing their "DNA Results," as well as their last name.

87. Further, the information transmitted to Google was accompanied by specific lines of code linking the information transmitted to Google to the user's identity. As Figure One shows, Defendants' website transmitted the identifier number attached to Google's '_cid', '_uid', and '_gid' cookies, which identify the user's Google account. Defendants' website also transmitted information that is commonly used to create a browser fingerprint, such as the user's language selection, screen resolution, physical location, and IP address information.

▾Query String Parameters view source view URL-encoded
v: 1
_v: j101
a: 1973189868
t: event
ni: 0
_s: 1
dl: https://www.myheritage.com/dna/matches/1666580790
dp: /dna/matches/
ul: en-us
de: UTF-8
dt: DNA results - Singh Web Site - MyHeritage
sd: 24-bit
sr: 1920x1080
vp: 553x884
je: 0
ec: GDPR Countries Experiment
ea: IP Country = US
el: IP State = DC
_u: YCDACEABBAAAACAAI~
jid:
gjid:
cid: 575239906.1730406621
uid: 66E21054B82AB0D993822C374280B7C7
tid: UA-1456293-26
_gid: 410667594.1730997005
gtm: 45He4au0n81TVPKLTSv852961163za200
cg1: /dna/matches/
cg2: dna
cg3: https://www.myheritage.com/dna/matches/1666580790
cg4: www.myheritage.com/dna/matches/1666580790
cd1: undefined.undefined
cd2: 66E21054B82AB0D993822C374280B7C7
cd3: www.myheritage.com/dna/matches/1666580790
cd4: 57
cd5: 2
cd6: 1
cd7: US
cd8: 82
cd9: 0
cd10: no_free_trial
cd12: 1
cd13: -basic
cd14: is_site_creator
cd15: 21
cd16: https://www.myheritage.com/dna/matches/1666580790
cd17: /family/dna-matches.php
cd23: user
cd24: user
cd26: -
cd27: -
cd28: -
cd29: -
cd30: DC
cd31: 1
cd39: 66E21054B82AB0D993822C374280B7C7
cd41: 0A810191:8DE4_0A81021A:1F90_672CEB0A_28CC513E:2C51
cd44: user
cd45: user
cd46: 1
cd48:
cd49:
cd52: 0
cd64:
cd83: 00000000
cd85: gtm.js
gcd: 13l3l3l3l1l1
dma: 0
tag_exp: 101823848~101925629
z: 1670844824

*Figure 1. Screenshot*[38] *depicting back-end network traffic from Defendants' Website which show information transmitted to Google.*

88. Likewise, when Defendants' customers view their ancestry analysis, Defendants' website transmits the results of their genetic test to Google. As the following screenshot ("Figure 2") shows, when Defendants' customers view their ancestry analysis, Defendants' website transmits the user's result to Google – in this case, the user's designation as belonging to the 'South Asian' genetic group. Along with the user's ancestry designation, Defendants also transmitted the identifying information linked to Google's'_cid', '_uid' and '_gid' cookies, the user's last name,

[38] Figure 1 consists of the top and bottom halves of a single screenshot, displayed side-by-side to enhance readability. When viewed on an internet browser, the network transmission records depicted appear as a contiguous list.

and information commonly used to generate a browser fingerprint, such as the user's language selection, screen resolution, location, and IP address information.



× Headers Payload Preview Response Initiator Timing Cookies

▾Query String Parameters view source view URL-encoded

v: 1
_v: j101
a: 1351561361
t: timing
_s: 2
dl: https://www.myheritage.com/dna/ethnicity/1666580790?ethnicityId=broadly-south-asian&groupId=
dp: /dna/ethnicity/
ul: en-us
de: UTF-8
dt: DNA results - Singh Web Site - MyHeritage
sd: 24-bit
sr: 1920x1080
vp: 570x901
je: 0
plt: 1228
pdt: 209
dns: 0
rrt: 1
srt: 216
tcp: 0
dit: 768
clt: 768
_gst: 1372
_gbt: 1585
_u: QCCACEABBAAAACAAI~
jid:
gjid:
cid: 575239906.1730406621
uid: 66E21054B82AB0D993822C374280B7C7
tid: UA-1456293-26
_gid: 410667594.1730997005
gtm: 45He4au0n81TVPKLTSv852961163za200
cg1: /dna/ethnicity/
cg2: dna
cg3: https://www.myheritage.com/dna/ethnicity/1666580790?ethnicityId=broadly-south-asian&groupId=
cd52: 0
cd64:
cd83: 00000000
cd85: gtm.js
gcd: 13l3l3l3l1l1
dma: 0
tag_exp: 101823848~101925629
z: 1063639364

*Figure 2. Screenshot depicting back-end network traffic from Defendants' Website which shows information transmitted to Google.*

89. By installing third-party Tracking Tools, including tracking Pixels, on its Website, Defendants knowingly and intentionally caused Plaintiffs' and Class Members' Genetic Testing Information to be transmitted to third parties, including Google.

## B. DEFENDANTS DISCLOSED PLAINTIFFS' AND CLASS MEMBERS' SENSITIVE INFORMATION TO THIRD PARTIES WITHOUT THEIR KNOWLEDGE OR CONSENT

### a. Defendants failed to inform Plaintiffs' and Class Members' of the disclosure of their Genetic Testing Information to Third Parties, in violation of its Privacy Statement.

90. Defendants' Privacy Statement informs its customers, in all caps, that "MYHERITAGE HAS NEVER SOLD OR LICENSED GENETIC DATA OR HEALTH DATA, AND WILL NEVER DO SO IN THE FUTURE" and that "MyHeritage has never sold or licensed personal data (like customer names, email addresses, residence addresses and family trees) and will never do so in the future."[39]

91. In truth, Defendants breached Plaintiffs' and Class Members' right to privacy by unlawfully disclosing their Genetic Testing Information to third parties, including Google.

92. Plaintiffs and Class Members had a reasonable expectation of privacy, based partly on Defendants' own representations to Plaintiffs and the Class, that Defendants would not disclose their Genetic Testing Information to third parties. Defendants did not inform Plaintiffs that it was sharing their Genetic Testing Information with third parties, including Google.

93. Plaintiffs relied on Defendants' Privacy Statement when deciding to purchase its DTC genetic testing products, use its Website, and entrust it with their Genetic Testing Information.

94. By engaging in this improper sharing of their Genetic Testing Information without Plaintiffs' and Class Members' consent, Defendants violated its own Privacy Statement and

---

[39] *Privacy Policy*, MYHERITAGE, https://www.myheritage.com/privacy-policy (last visited Jan. 5, 2025).

breached Plaintiffs' and Class Members' right to privacy, including under GIPA, by unlawfully disclosing their use of its genetic testing service and the results of their genetic testing.

95. Despite never telling users like Plaintiffs and Class Members, Defendants allowed third parties such as Google to intercept Plaintiffs' and Class Members' Genetic Testing Information and use it for advertising purposes.

## C. DEFENDANTS WERE ENRICHED BY THE DISCLOSURE OF PLAINTIFFS' AND CLASS MEMBERS' SENSITIVE INFORMATION TO THIRD PARTIES

### a. Defendants Received Material Benefits in Exchange for Plaintiffs' Genetic Testing Information

96. As explained, *supra*, users of Google's Business Tools, like Defendant, receive access to advertising and marketing analytics services in exchange for installing Google's Tracking Tools on their website.

97. Upon information and belief, Defendant, as a user of Google's Business Tools, received compensation in the form of advanced advertising services and cost-effective marketing on third-party platforms in exchange for allowing Google to collect Plaintiffs' and Class Members' Genetic Testing Information.

### b. Plaintiffs' and Class Members' Data Had Financial Value

98. Moreover, Plaintiffs' and Class Members' Genetic Testing Information had value and Defendants' disclosure and interception of that Genetic Testing Information harmed Plaintiff and the Class.

99. According to the financial statements of Facebook, another major seller of online advertisements, the value derived from user data has continuously risen. "In 2013, the average

American's data was worth about $19 per year in advertising sales to Facebook, according to its financial statements. In 2020, [it] was worth $164 per year."[40]

100. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

101. Several companies have products through which they pay consumers for a license to track certain information. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing history information.

102. The unauthorized disclosure of Plaintiffs' and Class Members' private and Genetic Testing Information has diminished the value of that information, resulting in harm including to Plaintiffs and Class Members.

## D. PLAINTIFFS' AND CLASS MEMBERS' REASONABLE EXPECTATION OF PRIVACY

103. At all times when Plaintiffs and Class Members provided their Genetic Testing Information to Defendant, they each had a reasonable expectation that the information would remain confidential and that Defendants would not share their Genetic Testing Information with third parties for a commercial purpose, unrelated to providing the DNA analysis that Plaintiffs and Class Members contracted with Defendants to receive.

104. Privacy polls and studies show that an overwhelming majority of Americans consider obtaining an individual's affirmative consent before a company collects and shares that individual's data to be one of the most important privacy rights.

---

[40] Geoffrey A. Fowler, *There's no escape from Facebook, even if you don't use it*, THE WASHINGTON POST (Aug. 29, 2021), https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/ (last accessed Jan. 5, 2025).

105. For example, a recent Consumer Reports study shows that 92-percent of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[41]

106. With regards to genetic testing specifically, the top two factors that Americans state as being important in making the "decision to participate in genetic research" are "[c]onfidentiality: knowing that your information will not be shared without your consent" and "[p]rivacy: knowing that your information will not be shared publicly.[42] In fact, more than half of Americans believe that the results of DTC genetic testing should not even be shared with law enforcement for the purpose of helping to solve crimes.[43]

107. Personal data privacy and obtaining consent to share Genetic Testing Information are material to Plaintiffs and Class Members.

**TOLLING AND ESTOPPEL**

108. Any applicable statutes of limitation have been tolled by Defendants' knowing and active concealment of their incorporation of Google's Tracking Tools into the Website.

109. The Pixels and other tracking tools on Defendants' Website were and are invisible to the average website visitor.

---

[41] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907 (last visited Nov. 12, 2024).

[42] *U.S. Public Views of Genetics: An ASHG Survey*, AMERICAN SOCIETY OF HUMAN GENETICS (Jan. 29, 2020), *available online at*: https://www.ashg.org/discover-genetics/public-views-of-genetics-survey/.

[43] Andrew Perrin, *About half of Americans are OK with DNA testing companies sharing user data with law enforcement*, PEW RESEARCH (Feb. 4, 2020), https://www.pewresearch.org/short-reads/2020/02/04/about-half-of-americans-are-ok-with-dna-testing-companies-sharing-user-data-with-law-enforcement/ (last accessed Jan. 5, 2025).

110. Through no fault or lack of diligence, Plaintiffs and Class Members were deceived and could not reasonably discover Defendants' deception and unlawful conduct.

111. Plaintiffs were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

112. Defendants had exclusive knowledge that the Website incorporated the Pixels and other Tracking Tools and yet failed to disclose to customers, including Plaintiffs and Class Members that their Genetic Testing Information would be disclosed or released to unauthorized third parties, including Google, through Defendants' Website.

113. Under the circumstances, Defendants were under a duty to disclose the nature, significance, and consequences of their collection and treatment of their customers' Genetic Testing Information. In fact, to the present Defendants have not conceded, acknowledged, or otherwise indicated to their customers that it has disclosed or released their Genetic Testing Information to unauthorized third parties. Accordingly, Defendants are estopped from relying on any statute of limitations.

114. Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

115. The earliest that Plaintiffs or Class Members, acting with due diligence, could have reasonably discovered Defendants' conduct would have been shortly before the filing of this Complaint.

## CLASS ACTION ALLEGATIONS

116. The Class that Plaintiffs seek to represent is defined as follows:

> All natural persons residing in Illinois who used Defendants' Website to view their genetic testing results and whose Genetic Testing Information was disclosed or transmitted to Google or any other unauthorized third party.

117. Excluded from the proposed Class are any claims for personal injury, wrongful death, or other property damage sustained by the Class; and any Judge conducting any proceeding in this action and members of their immediate families.

118. Plaintiffs reserve the right to amend the definitions of the Class or add subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

119. **Numerosity.** The Class is so numerous that the individual joinder of all members is impracticable. There are at least 10,000 individuals that have been impacted by Defendants' actions. Moreover, the exact number of those impacted is generally ascertainable by appropriate discovery and is in the exclusive control of Defendant.

120. **Commonality.** Common questions of law or fact arising from Defendants' conduct exist as to all members of the Class, which predominate over any questions affecting only individual Class Members. These common questions include, but are not limited to, the following:

a) Whether and to what extent Defendants had a duty to protect the Genetic Testing Information of Plaintiffs and Class Members;

b) Whether Defendants had duties not to disclose the Genetic Testing Information of Plaintiffs and Class Members to unauthorized third parties;

c) Whether Defendants adequately, promptly, and accurately informed Plaintiffs and Class Members that their Genetic Testing Information would be disclosed to third parties;

d) Whether Defendants violated the law by failing to promptly notify Plaintiffs and Class Members that their Genetic Testing Information was being disclosed without their consent;

e) Whether Defendants adequately addressed and fixed the practices which permitted the unauthorized disclosure of patients' Genetic Testing Information;

f) Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to keep the Genetic Testing Information belonging to Plaintiffs and Class Members free from unauthorized disclosure;

g) Whether Defendants violated the statutes asserted as claims in this Complaint;

h) Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendants' wrongful conduct;

i) Whether Defendants knowingly omitted material representations with respect to their data security and/or privacy policy practices; and

j) Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendants' disclosure of their Genetic Testing Information.

121. **Typicality.** Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Genetic Testing Information, like that of every other Class Member, was compromised as a result of Defendants' incorporation and use of the Tracking Tools.

122. **Adequacy.** Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

123. **Predominance**. Defendants have engaged in a common course of conduct toward Plaintiffs and Class Members in that all the Plaintiffs' and Class Members' data was unlawfully stored and disclosed to unauthorized third parties, including Google, in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over

any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

124. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

125. Defendants acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

126. Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a) Whether Defendants owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Genetic Testing Information and not disclosing it to unauthorized third parties;

b) Whether Defendants breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Genetic Testing Information;

c) Whether Defendants failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

d) Whether Defendants adequately and accurately informed Plaintiffs and Class Members that their Genetic Testing Information would be disclosed to third parties;

e) Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties;

f) Whether Class Members are entitled to actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendants' wrongful conduct.

127. Finally, all members of the proposed Class are readily ascertainable. Defendants have access to Class Members' names and addresses affected by the unauthorized disclosures that have taken place.

**COUNT I**
**VIOLATIONS OF ILLINOIS GENETIC INFORMATION PRIVACY ACT**
**410 ILCS 513/15**
**FAILURE TO MAINTAIN CONFIDENTIALITY OF GENETIC INFORMATION**

128. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 127 as if fully set forth herein.

129. Plaintiffs and Class Members were asked to provide, and did provide, her genetic information to Defendants for the purpose of a genetic test.

130. Defendants, or an agent acting on their behalf, released information derived from Plaintiffs' and Class Members' genetic tests to unauthorized third parties for the purpose of sending Plaintiff targeted advertisements.

131. Defendants, or an agent acting on their behalf, disclosed the results of their genetic tests in a manner that permitted identification of Plaintiffs and Class Members to unauthorized third parties, for the purpose of sending Plaintiffs and Class Members targeted advertisements.

132. Plaintiffs and Class Members did not provide specific written authorization for Defendants to share information derived from Plaintiff Carter's and Class Members' genetic tests with any third party.

133. Plaintiffs and Class Members were aggrieved by Defendants' violations of their statutorily protected rights to privacy in their genetic information, as set forth in GIPA, when Defendants disclosed information derived from their genetic tests with unauthorized third parties in a manner that permitted the third parties to identify the subject of the genetic test results.

134. By disclosing information derived from the genetic tests of Plaintiffs Class Members with unauthorized third parties as described herein, Defendants violated Plaintiffs' and Class Members' rights to privacy in their genetic information as set forth in GIPA.

135. Because Defendants knew, or reasonably should have known, that disclosing information derived from the genetic tests of Plaintiffs and Class Members with unauthorized third parties violated GIPA, their actions in violating GIPA were willful.

136. On behalf of themselves and the proposed Class Members, Plaintiffs seek: (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the proposed Class by requiring Defendants to comply with GIPA as described herein; (3) statutory damages of $15,000 or actual damages, whichever is greater, for each intentional and/or reckless violation of GIPA pursuant to 410 ILCS 513/40(2) or, in the alternative, statutory damages of $2,500 or actual damages, whichever is greater, for each negligent violation of GIPA

pursuant to 410 ILCS 513/40(1); and (4) reasonable attorneys' fees and costs and other litigation expenses pursuant to 410 ILCS 513/40(3).

**COUNT II**
**VIOLATIONS OF ILLINOIS GENETIC INFORMATION PRIVACY ACT**
**410 ILCS 513/30**
**UNAUTHORIZED DISCLOSURE OF GENETIC TEST RESULTS AND IDENTITIES**

137. Plaintiffs repeat and reallege the allegations contained in paragraphs 16 through 136 as if fully set forth herein.

138. Plaintiffs and Class Members were asked to provide, and did provide, her genetic information to Defendants for the purpose of a genetic test.

139. Defendants, or an agent acting on their behalf, released information derived from Plaintiffs' Class Members' genetic tests to unauthorized third parties for the purpose of sending Plaintiff targeted advertisements.

140. Defendants, or an agent acting on their behalf, disclosed the results of their genetic tests in a manner that permitted identification of Plaintiffs and Class Members to unauthorized third parties, for the purpose of sending Plaintiffs and Class Members targeted advertisements.

141. Plaintiffs and Class Members did not provide specific written authorization for Defendants to share information derived from Plaintiff Carter's and Class Members' genetic tests with any third party.

142. Plaintiffs and Class Members were aggrieved by Defendants' violations of their statutorily protected rights to privacy in their genetic information, as set forth in GIPA, when Defendants disclosed information derived from their genetic tests with unauthorized third parties in a manner that permitted the third parties to identify the subject of the genetic test results.

143. By disclosing information derived from the genetic tests of Plaintiffs and Class Members with unauthorized third parties as described herein, Defendants violated Plaintiffs' and Class Members' rights to privacy in their genetic information as set forth in GIPA.

144. Because Defendants knew, or reasonably should have known, that disclosing information derived from the genetic tests of Plaintiffs and Class Members with unauthorized third parties violated GIPA, their actions in violating GIPA were willful.

145. On behalf of themselves and the proposed Class Members, Plaintiffs seek: (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the proposed Class by requiring Defendants to comply with GIPA as described herein; (3) statutory damages of $15,000 or actual damages, whichever is greater, for each intentional and/or reckless violation of GIPA pursuant to 410 ILCS 513/40(2) or, in the alternative, statutory damages of $2,500 or actual damages, whichever is greater, for each negligent violation of GIPA pursuant to 410 ILCS 513/40(1); and (4) reasonable attorneys' fees and costs and other litigation expenses pursuant to 410 ILCS 513/40(3).

## COUNT III
## NEGLIGENCE

146. Plaintiffs repeat and reallege the allegations contained in in paragraphs 1 through 145 as if fully set forth herein.

147. Through using Defendants' Website, Plaintiffs and Class Members provided it with their Genetic Testing Information.

148. By collecting and storing this data, Defendants had a duty of care to use reasonable means to secure and safeguard it from unauthorized disclosure to third parties.

149. Defendants negligently failed to take reasonable steps to protect Plaintiffs' and Class Members' Genetic Testing Information from being disclosed to third parties, without their

consent, including to Google.

150. Defendants further negligently omitted to inform Plaintiffs and the Class that it would use their Genetic Testing Information for marketing purposes, or that their Genetic Testing Information would be transmitted to third parties.

151. Defendants knew, or reasonably should have known, that Plaintiffs and the Class would not have provided their Genetic Testing Information to Defendant, had Plaintiffs and the Class known that Defendants intended to use that information for unlawful purposes.

152. Defendants' conduct has caused Plaintiffs and the Class to suffer damages by having their highly personal, personally identifiable Genetic Testing Information accessed, stored, and disseminated without their knowledge or consent.

153. Plaintiffs and Class Members are entitled to compensatory, nominal, and/or punitive damages.

154. Defendants' negligent conduct is ongoing, in that it still holds the Genetic Testing Information of Plaintiffs and Class Members in an unsafe and unsecure manner. Therefore, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and other Class Members, pray for judgment against Defendants as follows:

A. an Order certifying the Class, and appointing the Plaintiffs and their Counsel to represent the Class;

B. equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure

of the Genetic Testing Information of Plaintiffs and Class Members;

C. injunctive relief requested by Plaintiffs, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members;

D. an award of all damages available at equity or law, including, but not limited to, actual, consequential, punitive, statutory and nominal damages, as allowed by law in an amount to be determined;

E. an award of attorney fees, costs, and litigation expenses, as allowed by law;

F. prejudgment interest on all amounts awarded and

G. all such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves and other members of the proposed Class, hereby demand a jury trial on all issues so triable.

Dated: July 23, 2025

Respectfully submitted,

*/s/ Mason Barney*

Mason Barney
Tyler J. Bean*
Sonjay C. Singh*
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: mbarney@sirillp.com
E: tbean@sirillp.com
E: ssingh@sirillp.com

Matthew J. Langley
David S. Almeida
**ALMEIDA LAW GROUP LLC**
849 W. Webster Ave.
Chicago, Illinois, 60614
(312) 576-3024
E: matt@almeidalawgroup.com
E: david@almeidalawgroup.com

**pro hac vice admission anticipated*
***Attorneys for Plaintiffs and the Class***