**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| KAREN CATER and ARTHUR PODROYKIN, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 25 C 224 |
| v. | ) ) ) | Judge Joan H. Lefkow |
| MYHERITAGE (USA) INC. and MYHERITAGE LTD., | ) ) ) | |
| Defendants. | ) ) | |

**<u>OPINION AND ORDER</u>**

Karen Cater and Arthur Podroykin, individually and on behalf of a putative class, bring

this suit against MyHeritage (USA) Inc. (MyHeritage USA) and MyHeritage Ltd. alleging

negligence and violations of the Illinois Genetic Information Privacy Act (GIPA) related to

defendants' genetic testing service and website. (Dkt. 35.) Defendants pose jurisdictional

challenges to the amended complaint, contest venue, and move to compel arbitration. For the

reasons set forth below, the court grants defendants' motion in part and denies in part. (Dkt. 39.)

Plaintiffs' claims against MyHeritage USA are dismissed without prejudice for lack of

jurisdiction. The court compels arbitration between plaintiffs and MyHeritage Ltd. Parties may

move to stay this action, pending arbitration.

**<u>BACKGROUND</u>**

MyHeritage USA is a Delaware corporation headquartered in Utah that operates the

website Geni.com. MyHeritage Ltd. is an Israeli limited company headquartered in Or Yehuda,

Israel, that operates as a direct-to-consumer genetic testing business that identifies customers'

"unique ethnic background" via the website MyHeritage.com (the Website). (Dkt. 35 ¶ 9.) To use

the genetic testing service, customers can purchase a test kit from defendants or a third-party retailer and then provide their DNA for analysis via saliva sample or cheek swab. To receive the results of their genetic test, customers must register an account on the Website. In the Website's privacy policy, it promises to "never s[ell] or license[] genetic data or health data." (Dkt. 35 ¶ 12.)

On April 20, 2020, Arthur Podroykin, a citizen of Illinois, purchased a genetic test kit from MyHeritage Ltd.'s website, MyHeritage.com. He registered an account on the Website that same day and was shown a message indicating that by signing up for an account with the Website, he agreed to the terms and conditions that were then operative. The then-operative terms and conditions were established in 2019 (2019 T&C). The 2019 T&C contained a change-in-terms provision giving MyHeritage Ltd. the ability to modify terms and conditions at any time. The 2019 T&C provides:

> "We reserve the right to modify any provision hereof from time to time, in our sole discretion, and such modification shall be effective immediately upon its posting on the Website. You agree to be bound to any changes to this Agreement if you continue to use the Service after any such modification is posted. … We retain the right, at our sole discretion, to modify this Agreement or the Service at any time. Changes in Service will be posted on the Website."

(Dkt. 40-2 at 2, 14.) Podroykin submitted his genetic material to the Website and his genetic results were made available on September 12, 2020.

Cater, also a citizen of Illinois, created an account on the Website and uploaded her DNA on October 3, 2021. The DNA she uploaded was not collected with a genetic test kit sold by defendants; rather, she uploaded DNA to the Website after collecting it with another company's test kit. Cater was shown the same sign-up screen as Podroykin, and she agreed to the same 2019 T&C. Cater's genetic results were made available on October 4, 2021.

In June 2024, MyHeritage Ltd. updated the terms and conditions, added an arbitration provision, and posted notice of the updated terms on the Website (2024 T&C). Podroykin and Cater both accessed the Website multiple times after the 2024 T&C were posted.

Plaintiffs allege that defendants use a suite of proprietary tools offered by Google to assist in their online marketing and advertising. In exchange for using these business tools, Google requires website operators to install tracking tools on their website, including Google "pixels" and third-party "cookies" that capture customers' personal information. Plaintiffs assert that by using these tracking tools, defendants transmitted their genetic information to Google without plaintiffs' consent.

This putative class action seeks injunctive and monetary relief against defendants for alleged violations of GIPA and for negligence. *See* 410 Ill. Comp. Stat. 513/1 *et seq*. Cater filed a complaint against the defendants on January 8, 2025, and Podroykin filed a related complaint on January 14, 2025.[1] Defendants move to dismiss the amended complaint for lack of standing under Rule 12(b)(1), for lack of personal jurisdiction under Rule 12(b)(2), and as time-barred under Rule 12(b)(6). They also move for transfer or dismissal for improper venue. Finally, defendants move to compel arbitration of all claims.

### LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) allows a party to seek dismissal of a complaint for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). When a movant presents a factual challenge to subject matter jurisdiction in their motion to dismiss under Rule 12(b)(1), the court "may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction

---

[1] The court consolidated the cases on March 11, 2025. Plaintiffs filed an Amended Consolidated Class Action Complaint on July 23, 2025.

exists." *Apex Digital, Inc.* v. *Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009) (citation omitted).

Federal Rule of Civil Procedure 12(b)(2) allows a party to seek dismissal of a complaint based on lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). Under Rule 12(b)(2), the non-movant bears the burden of establishing personal jurisdiction, but they need only make a *prima facie* showing of the existence of jurisdiction and their factual allegations are taken as true. *Reger* v. *Beason*, 805 F. Supp. 3d 864, 869 (N.D. Ill. 2025); *Matlin* v. *Spin Master Corp.*, 921 F.3d 701, 705 (7th Cir. 2019). The court may consider affidavits on the issue of personal jurisdiction, accepting both parties' affidavits as true, and where they conflict, resolving the conflict in plaintiffs' favor. *NBA Props., Inc.* v. *HANWJH*, 46 F.4th 614, 620 (7th Cir. 2022) (citation omitted).

A party may move the court to compel arbitration when there is an agreement to arbitrate, the dispute is within the scope of the agreement, and the opposing party refuses to arbitrate. *Zurich Am. Ins. Co.* v. *Watts Indus., Inc.*, 417 F.3d 682, 687 (7th Cir. 2005). Once a court is satisfied parties agreed to arbitrate, it must compel arbitration. 9 U.S.C. § 4. But if the "court determines that the making of the arbitration agreement is seriously disputed, 'the court shall proceed summarily to the trial thereof.'" *Tinder* v. *Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002) (quoting 9 U.S.C. § 4). Therefore, motions to compel arbitration are evaluated like motions for summary judgment, with the court looking beyond the pleadings to factual allegations submitted by the parties and drawing all inferences in favor of the non-movant. *Id*.

## ANALYSIS

### I. Jurisdiction

Defendants assert two jurisdictional challenges to the amended complaint and, as the court must satisfy itself that jurisdiction exists before reaching the merits of other arguments, the court begins its analysis here. *See Wisconsin Knife Works* v. *Nat'l Metal Crafters*, 781 F.2d 1280, 1282 (7th Cir. 1986) ("The first thing a federal judge should do when a complaint is filed is check to see that federal jurisdiction is properly alleged."); *see also George* v. *Rushmore Serv. Ctr., LLC*, 114 F.4th 226, 238 (3d Cir. 2024) (citing *Vaden* v. *Discover Bank*, 556 U.S. 49, 66 (2009)) (holding that a federal court must have jurisdiction over a motion to compel arbitration).

### A. Traceability to MyHeritage USA

Defendants argue that plaintiffs cannot establish traceability for Article III standing as to defendant MyHeritage USA. Standing is an element of subject matter jurisdiction in a federal civil action. *Moore* v. *Wells Fargo Bank, N.A.*, 908 F.3d 1050, 1057 (7th Cir. 2018). Article III standing has three elements: "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc.* v. *Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan* v. *Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). At the pleading stage, the plaintiff bears the burden of alleging facts sufficient to support each element of standing. *Id*. The first step for a court evaluating a challenge to subject matter jurisdiction is determining whether a facial or factual challenge is raised. *Silha* v. *ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). Facial challenges argue that the plaintiffs have not "*alleged* a basis of subject matter jurisdiction," while

factual challenges instead argue that "there is *in fact* no subject matter jurisdiction." *Apex Digital*, 572 F.3d at 443–44 (emphasis in original).

Here, defendants mount a factual challenge, as they assert plaintiffs cannot in fact trace their injury to MyHeritage USA. In reviewing factual challenges to standing, the court "may look beyond the pleadings and view any evidence submitted to determine if subject matter jurisdiction exists." *Silha*, 807 F.3d at 173. In response to a factual challenge to the existence of an element of standing, the plaintiff must provide "competent proof" as to that element's existence. *Bazile* v. *Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 278 (7th Cir. 2020). The Seventh Circuit has interpreted the "competent proof" standard as requiring a showing by a "preponderance of the evidence" that standing exists. *Id.*

Plaintiffs allege they were injured by both defendants when defendants transmitted their genetic information to Google via Google pixels installed on MyHeritage.com. Relying on an affidavit from Gilad Japhet, founder and CEO of MyHeritage Ltd., (Japhet Affidavit) defendants argue that plaintiffs cannot trace this injury to MyHeritage USA, because MyHeritage USA does not own or operate MyHeritage.com. Instead, MyHeritage USA operates Geni.com, and MyHeritage Ltd. operates MyHeritage.com.

In response, plaintiffs point to evidence showing Geni.com is run out of an office in California, even though MyHeritage USA, which operates Geni.com, is headquartered in Utah. This evidence includes (1) a blog post on MyHeritage.com stating that defendants have two offices in the United States, one in Utah and one in California, with the California office being home to the Geni team (the included hyperlink to the blog post is defunct); (2) emails from defendants to MyHeritage.com users in which the Utah address of MyHeritage USA was included in the email footer (the emails were not included as exhibits); and (3) MyHeritage Ltd.'s

registered agent in Utah being MyHeritage USA. Plaintiffs assert this evidence shows that when defendants provide an American address for MyHeritage.com, that address is the Utah address. According to plaintiffs, this shows traceability between MyHeritage USA and MyHeritage.com because Geni.com, which MyHeritage USA purportedly runs, operates out of California, not Utah.

This argument is unconvincing. The evidence does not show that MyHeritage USA has a hand in running MyHeritage.com. MyHeritage Ltd., which Japhet attested is the operator of MyHeritage.com, is also registered to do business at the Utah address. That MyHeritage USA and MyHeritage Ltd. share the Utah address does not show by a preponderance of the evidence that MyHeritage USA has anything to do with the operation of MyHeritage.com. And MyHeritage USA being the registered agent of MyHeritage Ltd. does not speak to MyHeritage USA's involvement in the operation of the Website such that it becomes more likely than not that plaintiffs' injuries are fairly traceable to MyHeritage USA. For those reasons, plaintiffs have not met their burden of proving by a preponderance of the evidence that the traceability element of standing is satisfied as to MyHeritage USA.[2]

### B. Jurisdictional Discovery Is Not Warranted

Plaintiffs request jurisdictional discovery be ordered on this issue. The court may grant jurisdictional discovery when plaintiffs make a "*prima facie* showing with some competent evidence" demonstrating ambiguity on the jurisdictional issue. *See N. Texas Equal Access Fund* v. *Thomas More Soc'y*, 728 F. Supp. 3d 887, 901 (N.D. Ill. 2024) (citation omitted). Plaintiffs

---

[2] Defendants point to a District of New Jersey case where MyHeritage USA was dismissed after the court held it had been fraudulently joined. *Atlas Data Priv. Corp.* v. *Blackbaud, Inc.*, 757 F. Supp. 3d 605, 618 (D.N.J. 2024) ("MyHeritage (USA) has no involvement whatsoever with the website in issue."). Defendants urge this court to make a similar finding. While *Atlas* is somewhat useful, the declaration in that case, which asserted lack of involvement by MyHeritage USA in MyHeritage.com, went uncontested. *Id*. Here, however, plaintiffs do contest the assertions made in the Japhet Affidavit, so the court does not rely on the finding in *Atlas*.

also have the burden of explaining to the court what "specific discovery they would take or how taking discovery would aid them in establishing" the relevant jurisdictional facts. *Id.* Plaintiffs here have not met that bar. First, as explained above, they fail to establish sufficient ambiguity regarding the veracity of the Japhet Affidavit's assertion that MyHeritage USA does not own or operate the Website. Second, their request for jurisdictional discovery is not sufficiently specific: they ask only that the jurisdictional discovery uncover "relevant facts regarding control of the Website." This general request does not articulate what type of discovery is sought or how that discovery would advance plaintiffs' argument regarding traceability. *See John Crane Inc.* v. *Simon Greenstone Panatier Bartlett, APC*, No. 16-cv-05918, 2017 WL 1093150, at *13 (N.D. Ill. Mar. 23, 2017) (rejecting plaintiff's one-sentence request for discovery as insufficiently specific). For those reasons, plaintiffs' request for jurisdictional discovery is denied. Plaintiffs' claims against MyHeritage USA are dismissed without prejudice for lack of subject matter jurisdiction.

### C. The Court Has Personal Jurisdiction over MyHeritage Ltd.[3]

Plaintiffs bear the burden of establishing personal jurisdiction. *Matlin*, 921 F.3d at 705. Where, as here, the defendant opposes personal jurisdiction, the plaintiff must only make a *prima facie* showing of personal jurisdiction over the defendant to survive a motion to dismiss. *Id.* The court is to "take as true all well-pleaded facts alleged in the complaint and resolve any factual disputes in the affidavits in favor of the plaintiff[s]." *Id*. (alteration in original) (quoting *Tamburo* v. *Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010)).

A plaintiff may demonstrate personal jurisdiction over a defendant through either general or specific jurisdiction. *See Mobile Anesthesiologists Chi., LLC* v. *Anesthesia Assocs. of Hous.*

---

[3] Though plaintiffs direct their personal jurisdiction arguments toward both defendants, the court only analyzes them as to MyHeritage Ltd., as claims against MyHeritage USA have been dismissed due to lack of subject matter jurisdiction.

*Metroplex, P.A.*, 623 F.3d 440, 444 (7th Cir. 2010). Here, plaintiffs only assert the existence of specific personal jurisdiction over the defendants. A court may exercise specific personal jurisdiction over a defendant when their forum-state contacts "directly relate to the challenged conduct or transaction." *Tamburo*, 601 F.3d at 702. Plaintiffs meet their burden of establishing specific personal jurisdiction by showing that (1) defendants purposefully directed their activities at the forum state; (2) plaintiffs' alleged injuries arose out of defendants' forum-related activities; and (3) the exercise of personal jurisdiction would comport with traditional notions of fair play and substantial justice. *Curry* v. *Revolution Lab'ys*, LLC, 949 F.3d 385, 398 (7th Cir. 2020) (quoting *Lexington Ins. Co.* v. *Hotai Ins. Co., Ltd.*, 938 F.3d 874, 878 (7th Cir.2019)). For the following reasons, plaintiffs have met their burden as to MyHeritage Ltd.

First, in the Seventh Circuit, a single online sale to a forum state resident is sufficient to establish a defendant purposefully directed its activities at the forum state. *See NBA Props.*, 46 F.4th at 624 (finding online retailer directed its activities to Illinois when it "unequivocally asserted a willingness to ship goods to Illinois and established the capacity to do so" despite only one sale made in Illinois); *see also Curry*, 949 F.3d at 399 (finding purposeful direction to Illinois where defendants sent purchase confirmation emails to Illinois residents and shipped products to Illinois addresses). Plaintiffs allege that MyHeritage Ltd. marketed its test kits to Illinois residents through the Website, processed purchases made by Illinois customers, and shipped its test kits to the Illinois addresses of those customers. Plaintiffs have thus shown defendants purposefully directed their business to Illinois.

Second, plaintiffs' injuries are sufficiently related to MyHeritage Ltd.'s sale of genetic test kits in Illinois. Plaintiffs allege that they were harmed by MyHeritage Ltd.'s disclosure of their genetic testing results via Google pixels and cookies. Such results were obtained through a

9

genetic testing kit that MyHeritage Ltd. marketed, sold, and shipped to Podroykin in the state of Illinois. Because MyHeritage Ltd. would not have been in a position to unlawfully disclose plaintiffs' genetic information had it not targeted Illinois and thereby obtained plaintiffs' genetic information, MyHeritage Ltd.'s forum-related activities are sufficiently linked to plaintiffs' GIPA claims.

Third, subjecting MyHeritage Ltd. to personal jurisdiction in Illinois comports with traditional notions of fair play and substantial justice. Plaintiffs allege, and MyHeritage Ltd. does not challenge, that MyHeritage Ltd. tailored the products available to Illinois residents to Illinois specifically. MyHeritage Ltd. offers the "Photo Tagger" feature of the Website in 46 states but does not offer the feature in Illinois. MyHeritage.com's privacy policy states that, "[t]he Photo Tagger feature identifies faces in your photos and creates facial recognition models (i.e., biometric information).… In the United States, we do not offer Photo Tagger in California, Illinois, Texas, and Washington and do not, therefore, collect biometric information in those states." *US State Privacy Notice*, MYHERITAGE.COM, *available online at*: https://www.myheritage.com/us-state-privacy-notice. Plaintiffs allege MyHeritage Ltd. presumably did this to insulate itself from liability under the Illinois Biometric Information Privacy Act. [4] *See* 740 Ill. Comp. Stat. 14/1*, et seq*. MyHeritage Ltd. does not challenge the unavailability of the Photo Tagger feature in Illinois.

The feature's exclusion "shows both that [MyHeritage Ltd.] knew that conducting business with residents of a particular state could subject it to jurisdiction there and also that it knew how to protect itself from being haled into court in any particular state." *Illinois* v. *Hemi Grp. LLC*, 622 F.3d 754, 758 (7th Cir. 2010) ("[Defendant's] election not to do business with

---

[4] A plaintiff opposing a motion to dismiss may permissibly "elaborate on his factual allegations so long as the new elaborations are consistent with the pleadings." *Geinosky* v. *City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).

New York demonstrates that it should have foreseen being subject to litigation in Illinois as a result of its cigarette sales to Illinois customers."). MyHeritage Ltd.'s actions are perhaps even more revealing than those of the defendant in *Hemi*, as MyHeritage Ltd. chose to continue to do business in Illinois, but intentionally made a biometrics-using feature unavailable in Illinois, presumably to protect itself from liability under an Illinois-specific biometrics law. This demonstrates that MyHeritage Ltd. reasonably foresaw being subjected to personal jurisdiction in Illinois related to offering its products to Illinois residents. MyHeritage Ltd. cannot claim unfair surprise over the exercise of personal jurisdiction in Illinois.

For the above reasons, the court has both subject matter and personal jurisdiction over MyHeritage Ltd. but lacks subject matter jurisdiction over MyHeritage USA.

## II. Arbitration

As the court has jurisdiction over MyHeritage Ltd., it may now consider its motion to compel arbitration. *See George*, 114 F.4th at 238 (citing *Vaden*, 556 U.S. at 66). The Federal Arbitration Act (FAA) "mandates enforcement of valid arbitration agreements." *Gupta* v. *Morgan Stanley Smith Barney, LLC*, 934 F.3d 705, 710 (7th Cir. 2019) (citing 9 U.S.C. §§ 2, 4). The FAA reflects "both a liberal federal policy favoring arbitration . . . and the fundamental principle that arbitration is a matter of contract." *Id.* (quoting *AT&T Mobility LLC* v. *Concepcion*, 563 U.S. 333, 339 (2011)).

Defendants have moved to compel arbitration, while plaintiffs dispute the validity of the arbitration clause in the 2024 Terms and Conditions (2024 T&C). A court must compel arbitration when three elements are shown: "a written agreement to arbitrate, a dispute within the scope of the arbitration agreement, and a refusal to arbitrate." *Zurich Am. Ins. Co.*, 417 F.3d at 687; *see* 9 U.S.C. § 4. To avoid being compelled to arbitrate, the plaintiffs must "identify a

triable issue of fact concerning the existence of the agreement in order to obtain a trial on the merits of the contract." *Tinder*, 305 F.3d at 735. Though the FAA does not provide an evidentiary standard by which to evaluate motions to compel arbitration, courts apply a standard akin to summary judgment, with all inferences drawn in favor of the non-movant. *See id.*

### A.  Written Agreement to Arbitrate

Although the parties dispute whether a written agreement to arbitrate exists under the 2024 T&C, they do not dispute that the 2019 T&C are binding. So, whether a valid arbitration agreement exists turns on two questions: (1) whether the 2019 T&C allows defendants to unilaterally add an arbitration agreement to the 2024 T&C; and (2) whether plaintiffs are bound by the 2024 T&C. Because the court finds that unilateral modification is permitted by the 2019 T&C and Illinois law and that the plaintiffs are bound by the arbitration provision in the 2024 T&C, defendants have shown that a written agreement to arbitrate exists.

### 1.  Unilateral Modification is Lawful

Federal courts apply state-law principles of contract formation in determining whether a written agreement to arbitrate exists. *See Druco Restaurants, Inc.* v. *Steak N Shake Enters., Inc.*, 765 F.3d 776, 781 (7th Cir. 2014). In Illinois, the goal of state courts in interpreting contracts is to give effect to the intent of the parties as expressed in the contract. *See Maturo* v. *CF Eagle Brook Arcis, LLC*, 2025 IL App (2d) 240577-U, ¶ 24. To that end, "[u]nambiguous contract terms must be afforded their plain and ordinary meaning." *Id.*

Illinois permits parties to agree to allow one party to unilaterally modify a contract, including unilateral additions of arbitration provisions. *See Miracle-Pond* v. *Shutterfly, Inc.*, No. 19 CV 04722, 2020 WL 2513099, at *5 (N.D. Ill. May 15, 2020) (collecting cases); *see, e.g., Williams* v. *TCF Nat'l Bank*, No. 12 C 05115, 2013 WL 708123, at *6, 9 (N.D. Ill. Feb. 26, 2013)

(enforcing revised arbitration provision added via a change-in-terms clause). Modifications made pursuant to such unilateral change-in-terms provisions are enforceable even when the modifying party does not provide notice of the modification. *See Miracle-Pond*, 2020 WL 2513099 at *5; *see also Kinkel* v. *Cingular Wireless LLC*, 857 N.E.2d 250, 259 (Ill. 2006) (holding that parties to a contract may "expressly reserve[ ] the right to unilaterally modify terms and conditions of the agreement, at any time, without notice").

> The 2019 T&C provides:
>
> "We reserve the right to modify any provision hereof from time to time, in our sole discretion, and such modification shall be effective immediately upon its posting on the Website. You agree to be bound to any changes to this Agreement if you continue to use the Service after any such modification is posted … We retain the right, at our sole discretion, to modify this Agreement or the Service at any time. Changes in Service will be posted on the Website."

(Dkt. 40-2 at 2, 14.) Plaintiffs contend that the language "modify any provision hereof" allows defendants to make changes to existing provisions in the 2019 T&C but not to add new provisions like the arbitration provision added to the 2024 T&C. (*Id*. at 2.) But plaintiffs ignore that in addition to allowing defendants to "modify any provision hereof," the 2019 T&C also allows defendants to "modify this Agreement . . . at any time," which does not limit defendants to modifications of specific provisions, but rather encompasses the entirety of the contract. (*Id*. at 2, 14.)

Plaintiffs then are left only with their argument that the term "modify" does not give defendants the power to make a change in the form by adding a whole new provision to the contract. As a matter of plain meaning, this argument fails. Black's Law Dictionary defines "modify" as "to make somewhat different." *Modify*, BLACK'S LAW DICTIONARY (12th ed. 2024). The leading lay dictionary offers "to make basic or fundamental changes in[,] often to give a new orientation to or to serve a new end" as a definition of "modify." *Modify*, MERRIAM-WEBSTER,

*available online at*: https://www.merriam-webster.com/dictionary/modify. Because a contract is made somewhat different and serves a new end when an arbitration provision is added, the power to modify includes the power to add an arbitration agreement. Moreover, Illinois courts and other district courts have rejected narrow readings of change-of-terms provisions, such as plaintiffs propose. *See Hutcherson* v. *Sears Roebuck & Co.*, 793 N.E.2d 886, 900 (2003) (interpreting a change-of-terms provision broadly to allow the addition of an arbitration provision); *Herrington* v. *Union Planters Bank, N.A.*, 113 F. Supp. 2d 1026, 1031 (S.D. Miss. 2000) (rejecting the argument that language empowering a party to "revise" a contract means that the party may not add an arbitration agreement").

Defendants submit, and plaintiffs do not challenge, that defendants posted notice of the updated 2024 T&C on the Website, as required by the 2019 T&C to effectuate a modification to the agreement. Illinois law generally allows effectuation of updated contract terms via posting on a website. *See Miracle-Pond*, 2020 WL 2513099 at \*9 (upholding the addition of an arbitration provision to an online service's terms and conditions when the original agreement allowed unilateral modification effectuated by posting on website).

Because the 2019 T&C's use of the word "modify" empowers defendants to change the contract by adding an arbitration provision, and because defendants effectuated this modification as required by the 2019 T&C by posting on the Website, the defendants' unilateral modification is lawful.

### 2. Plaintiffs Are Bound by 2024 T&C

Though the parties agree that the 2024 T&C was posted on the Website, they disagree about whether Cater visited the Website after the 2024 T&C went into effect, thereby binding her to the updated terms, as the 2019 T&C provide: "You agree to be bound to any changes to this

Agreement if you continue to use the Service after any such modification is posted." (Dkt. 40-2 at 2.) Plaintiffs originally claimed in their Amended Complaint that Cater last visited the Website in November 2023, before the 2024 T&C was posted. But the Japhet Affidavit attests that MyHeritage Ltd.'s records show Cater accessed the Website at least nine times after her claimed last visit in November 2023 and after the 2024 T&C were posted, while Podroykin accessed the Website five times after the 2024 T&C were posted. Plaintiffs failed to refute this in their response.

When a party does not dispute a fact in its response to a motion to compel arbitration, that fact cannot be said to be reserved to the factfinder such that it requires the court to try that fact before compelling arbitration. *See Agha* v. *Uber Techs., Inc.*, 730 F. Supp. 3d 756, 763 (N.D. Ill. 2024), *aff'd,* 148 F.4th 910 (7th Cir. 2025) (holding that plaintiffs failed to establish a dispute of material fact when, in their response brief, they did not directly dispute defendants' assertion that plaintiffs entered into at least one relevant arbitration agreement). Because plaintiffs fail to show a genuine dispute over whether they accessed the Website after the 2024 T&C were posted, they are bound to the arbitration agreement in the 2024 T&C. Defendants have met their burden of showing there exists a written agreement to arbitrate.[5]

### B. Dispute within Scope of Arbitration Agreement

The second element a party moving to compel arbitration must show is that the dispute in question falls within the scope of the arbitration provision—*i.e.*, the arbitrability of the dispute. This dispute alleges violations of GIPA. The parties agreed in the 2024 T&C to delegate

---

[5] The court need not reach the question of whether the 2024 T&C require emailed notice of the arbitration provision because the 2019 T&C govern what is required to effectuate modifications to the contract, and defendants complied with the 2019 T&C in adding the arbitration provision. *See Maturo*, 2025 IL App (2d) 240577-U, ¶ 28 (requiring notice be made pursuant to the notice requirements outlined in the original agreement).

"exclusive and sole authority to determine all threshold arbitrability issues, including whether a Claim is arbitrable," to the arbitrator, so the court defers the question of whether plaintiffs' GIPA claims are within the scope of the arbitration provision to the arbitrator. (Dkt. 40-3 at 25); *see Lathan* v. *Uber Techs., Inc.*, 266 F. Supp. 3d 1170, 1173 (E.D. Wis. 2017) (holding contract language delegating to the arbitrator questions of "interpretation and application" of the arbitration provision is enforceable).

### C. Refusal to Arbitrate

The final element the party moving to compel arbitration must show is that the non-movant has refused to arbitrate. In filing their suit before a court and not before an arbitrator, and in arguing against their obligation to arbitrate in their response to defendants' motion to compel arbitration, plaintiffs have shown a refusal to arbitrate. Defendants' burden to show refusal is satisfied. *See Zurich Am. Ins. Co.*, 417 F.3d at 691 (finding refusal to arbitrate when non-movant disclaimed its duty to arbitrate in a court proceeding).[6]

### **CONCLUSION AND ORDER[7]**

For the foregoing reasons, defendants' motion to compel arbitration and dismiss plaintiffs' complaint is granted in part and denied in part. Plaintiffs' claims against MyHeritage USA are dismissed without prejudice for lack of jurisdiction. The court compels arbitration between plaintiffs and MyHeritage Ltd. Parties may move to stay this action, pending arbitration.

Date: March 27, 2026

_____
U.S. District Judge Joan H. Lefkow

---

[6] In light of its order compelling arbitration, the court does not reach defendants' arguments related to venue, forum selection, or time-barred claims.

[7] The Clerk is directed to change the case caption from plaintiff Karen Carter to Karen Cater and defendant MyHeritage Ltd. Corporation to MyHeritage Ltd.